GRAVER v. EDISON ELECTRIC ILLUMINATING CO. OF BROOKLYN.

(Supreme Court, Appellate Division, Second Department.   May 12, 1908.)

1. ELECTRICITY—QUASI PUBLIC CORPORATIONS—RATES—DISCRIMINATION.

Defendant furnished electricity to plaintiff at 10 cents per kilowatt hour under a contract containing no guaranty by which plaintiff undertook to take any given number of kilowatt hours of consumption per month. Defendant furnished electricity under similar circumstances to other consumers at 7½ and 5 cents per kilowatt hour under contracts guaranteeing the use of the current for from 750 to 1,250 kilowatt hours per month. All of such contracts, however, provided for a charge of 10 cents per kilowatt hour for the first two hours of service (which in practical operation would be the two hours of maximum use); the lesser rates being made for the succeeding hours. Held, that such contracts did not show an illegal discrimination against plaintiff; the mere fact that plaintiff paid a higher price for substantially the same number of kilowatt hours as his neighbors did not being conclusive on such question.

2. SAME—BASIS OF RATES.

A corporation engaged in furnishing electric current like other quasi public corporations is entitled to earn a fair income on its investments, and may fix rates based on the cost of production taking into account not only the cost of coal, labor, etc., but the investment necessary to carry on the enterprise, and, acting in good faith, it may make experimental contracts to reach a basis for future charges, even though this would result in giving for a limited time a better rate to a few customers than was given to others receiving substantially the same service.

Gaynor, J., dissenting.

Appeal from Municipal Court of New York.

Action by William Graver against the Edison Electric Illuminating Company of Brooklyn. Judgment for plaintiff, and defendant appeals. Reversed.

Argued before WOODWARD, JENKS, HOOKER, GAYNOR, and MILLER, JJ.

Alton B. Parker (John W. Searing, on the brief), for appellant.
Philip B. Adams (Charles C. Bunker, on the brief), for respondent.

WOODWARD, J. This action was brought to recover the sum of $403.35 upon a complaint which alleged that between January 1, 1906, and May 8, 1907, inclusive, the defendant furnished to the plaintiff, at his request, 12,936 kilowatt hours of electric current, for which the defendant charged the plaintiff at the rate of 10 cents per kilowatt hour, amounting in all to the sum of $1,293.60, which plaintiff paid in full to the defendant upon the rendition of bills for the same; that during all of said time the defendant wrongfully and unjustly discriminated against the plaintiff in rendering to other persons, firms, and corporations under similar circumstances and conditions, the same

service at a much less rate or price per kilowatt hour, upon a guaranteed consumption of 750 kilowatt hours each month; that the sum collected and received by the defendant from the plaintiff was excessive and unjust to the extent of the amount of the excess over the rate charged for the same service under the same conditions to others of its customers. The answer admitted furnishing the service at the rates mentioned under the provisions of a written contract, denying the other allegations of the complaint, except the demand for a refunding of payments made, and alleged that it had charged all other consumers the same rates as those charged to the plaintiff, except in cases where the consumer gave a written guaranty to use a certain number of kilowatt hours of current in each month, and to pay for the same whether it was used or not.

Upon the trial it appeared, without contradiction, that the plaintiff's contract did not undertake to guarantee any given number of kilowatt hours of consumption per month, while in each of the cases where it was sought to show discrimination the contract provided that the consumer should use at least 750 kilowatt hours of current each month, and the evidence further disclosed that these contracts were made for experimental purposes, to determine how low a guaranty could be safely accepted in the conduct of the business with a concession of rates. It was shown that the defendant had been affording a rate of 10 cents, 7½ cents, and 5 cents per kilowatt hour for current furnished under a contract to use at least 1,250 kilowatt hours per month, and for the purpose of experimenting upon a more advantageous contract for customers, a few customers using approximately the 1,250 kilowatt hours were given contracts in which the guaranteed use was reduced to 750 kilowatt hours per month, and the defendant, after conducting this experiment for a time, actually afforded this rate and this form of a contract to its customers generally. The plaintiff has been given a judgment upon the theory that the defendant had unlawfully collected a larger sum than was charged to its customers generally for similar service under like conditions, and, if the facts proven established this, it is not to be doubted that the judgment would be sustained. We are of the opinion, however, that under the facts established by the defendant without contradiction this was not a case of discrimination within the spirit of the law, and that the judgment proceeds upon a wrong theory. The mere fact that the plaintiff paid a higher price for substantially the same number of kilowatt hours than two of his neighbors is not conclusive. Electricity for light and power is a different thing than ordinary commodities. The whole test of cost and of fairness in rates does not depend upon the measurement of the current, and a discrimination in rates which might give rise to an action in the transmission of a telegram would not constitute illegal discrimination in furnishing commercial current. A corporation engaged in furnishing an electric current is entitled, like other quasi public corporations, to earn a fair income upon its investment. It has a right to fix its rates upon the cost of the production, taking into account, not only the cost of coal, labor, etc., but the investment which is necessary to carry on the enterprise, and, acting in good faith, it has a right to make experimental contracts for the purpose of reaching a basis for future charges, even

though this should result in giving for a limited time a better rate to a few customers than was given to others receiving substantially the same amount of current. To hold otherwise would be to stand in the way of the best development of the business and the fairest service to the public generally.

But it is not necessary to stand upon this proposition. When the nature of the business is taken into consideration, when it is remembered that a corporation holding a public franchise owes the obligation of being prepared to furnish all who may desire its service within the limits of its territory, it must be entirely obvious that the corporation must have an equipment which is capable of affording the maximum amount of current for which there is a reasonable probability of a demand, and to do this the corporation must have an investment largely in excess of what would be necessary if it was called upon to furnish a fixed amount for a given number of hours each day. The assumption that the "current taken by a large house or of twenty houses costs the same the unit in the production as that taken by a small house or one house" is merely a relative truth. It is true of any given moment, but the question of when it is produced is of importance in the calculation. It is a well-recognized proposition in electrical engineering, based on current produced by steam power, that there is a certain point where all of the elements concur to produce the greatest amount of energy with the least possible consumption of fuel—with the least possible expenditure—and this is technically known as "the load" of the engine. For instance, we have an engine rated at 40 horse power. Assume this to be the "load." It is not the maximum capacity of the engine. It is the point where it reaches its highest economic utility. It may, under high pressure, develop 45, or even 60, horse power; but this result is accomplished under conditions which produce waste, so that, when an engine is operated above "load," it is done at an economic loss. It costs more to produce the current than it does when the engine is working at "load." What is true of an engine working above "load" is true in a larger degree of one working under "load," for in that case we have all of the fixed, or what is known as "overhead" charges, such as interest, insurance, etc., as well as salaries, labor, and other charges in the same amount that would be involved if the engine was working up to its normal capacity and producing its full measure of current. Having these facts in mind, let us suppose a district supplied by an electric lighting plant to require a maximum of 100,000 kilowatt hours (and a kilowatt is 1,000 watts, and a kilowatt hour is 1,000 watts sustained for the period of one hour). Take, for example, a downtown district in the borough of Manhattan. In the winter months the maximum demand will be between the hours of 4:30 and 6:30 p. m. If the installment is made upon the basis of producing this maximum current with the engines working at "load," there will be an investment largely out of proportion to the current marketed; for it is a well-known fact that after 6:30 in the period mentioned there is relatively very little use of lighting current in the locality mentioned; probably not 50 per cent. of the amount used in the two hours preceding that time. The result is either that the corporation must install less engine power and work it above "load"

during the maximum consumption, or it must operate a plant capable of producing the maximum supply below "load," and thus be subjected to an increased cost of production, in either of which events it is costing more to produce the current than would be the case if there was a fixed demand for the maximum capacity of the plant working at "load." All of the contracts in evidence in this case apparently recognize this condition, for in each of them there is a charge of 10 cents per kilowatt hour for the first two hours of service (which in practical operation would be the two hours of maximum use), and the lesser rates are made for the succeeding hours. Of course, if electricity could be stored up like barrels of flour, and turned on when the demand was at its maximum, and turned off when it was below, so that the engines could be worked at "load" all of the time, the problem would be very simple. But the truth is that the electric current is produced just as it is used—at the instant of the demand—and it is the necessity of producing it under these conditions that differentiates it from every other known commercial undertaking. Obviously if the plaintiff's 12,936 kilowatt hours were made up of the first two hours of each day, as might be the case if his installation of lamps was large enough, there would be no discrimination against him in the price charged, for that is the rate charged under any of the contracts for these hours, and, before there could be any discrimination established, it would be necessary to show that the current with which the comparison was made was furnished after the first two hours, and that the plaintiff's current was not furnished in the first two hours. There is some evidence tending to show, perhaps, that the plaintiff had an installation of 101 sixteen candle power lights, but our attention is not called to any evidence to show that this number of lights might not have required the full amount of current used during the first two hours of the days involved in this controversy; and, in the absence of such evidence, how is the court to know that there was, in fact, any difference in the rates charged to the plaintiff from what were paid by those in his neighborhood? Suppose the plaintiff burned all of his lights for the first two hours, and then turned them off, while his neighbor burned 10 lights for the same length of time, and then increased them to 50 or 100, how shall we know that there was any discrimination against the plaintiff? The mere fact that one man gets an equal amount of current for less money than his neighbor is not conclusive. It must be shown that it was under the same circumstances and conditions, and this is not shown unless it is established that the current was furnished during substantially the same hours and in substantially the same amount. It should appear, at least, that the bills with which comparison is made were contracted for substantially the same number of lights, of equal capacity, and during substantially the same hours, and the evidence in this case does not show this, does not pretend to show it. All that it claimed is that two or three persons doing business near the plaintiff received about the same amount of current as the plaintiff during the months for which comparisons were made, and that they paid less for the same than the plaintiff, but, so far as the evidence goes, it may be that both of these neighbors used only a small amount of current during the early hours of

the use, and large quantities during the later hours, so that there is no foundation on which this judgment may properly rest.

Beyond this, however, is the fact that in both of the cases with which comparison has been made the contract provided that they would use at least 750 kilowatt hours each month, while on the part of the plaintiff his contract did not oblige him to take any given amount. He might use 100 kilowatt hours or 1,000. The defendant had no basis of calculation. It was obliged, in the discharge of its obligations under its franchise, to be prepared to furnish any amount the plaintiff might desire; while, on the other hand, the plaintiff might not take a particle of the current in any one month, and the corporation could only collect for an agreed amount. To say that the plaintiff was receiving his current under the same circumstances and conditions as those who had agreed to take a certain amount, or to pay a certain amount whether they used it or not, is a mere arbitrary assertion, not warranted by the facts. In view of the peculiar nature of electricity, of the conceded difference in cost under differing conditions, and the importance of knowing the amount of current and the times in which it is to be demanded, we think it is a very material condition surrounding the transaction that the contract in one case provides for the use of a given quantity, while in the other the party is free to use much or little as it pleases him. While he, in effect, demands that the corporation shall be prepared to furnish current for his entire equipment, he does not guarantee to the defendant that he will use enough to make it profitable for it at any price, and it is only fair that, within reasonable limits, the corporation should be permitted to exact a rate which will compensate it for its larger investment and for the risk it runs of not having a market for the product which it must be prepared to deliver. Before the plaintiff would be entitled to recover, therefore, it would be necessary to show that the price exacted of him was out of proportion to the differences in conditions, and this there is no attempt to do. We do not find any controlling authorities upon this question, though there are more or less analogous cases sustaining the view we have taken, and we prefer to stand upon the reasoning of the question than to cumber the reports with citations.

The judgment appealed from should be reversed, with costs.

All concur, except GAYNOR, J., who dissents.

GAYNOR, J. (dissenting). The plaintiff found that he had been charged a higher rate for the electric current furnished by the defendant to him to light his store than the defendant charged for such current to the similar stores of his near neighbors on the same street. For instance, he was charged 10 cents the kilowatt hour (which is the quantity and not the time unit of current measurement), viz., $87 for 870 kilowatt hours for a month, while another was charged only $63.83 for 954 kilowatt hours, and another $61.43 for 750 kilowatt hours, during the same time; and in this way, month by month, the difference, i. e., the total overcharge against him for which he has recovered, was made up.

The defendant showed that the discrimination against the plaintiff resulted from the fact that it had contracts with his said neighbors by which they agreed to pay for not less than 750 kilowatt hours the month, whether used or not, and for as much more as they should use; and that the reduced price was given to them on account of this guarantee. Such reduced price was 10 cents the said quantity unit for the first two units, 7½ cents for the next two and 5 cents for the excess, based on and applied to the average daily use.

The defendant did not communicate to the plaintiff that such reduced terms were given or open to any one, and he knew nothing of them. This in and of itself made out a case of illegal discrimination, for the plaintiff was in the same case as his neighbors in respect of the supplying of electric current to him by the defendant. There was nothing to distinguish his case from the general case of all. The defendant could not, at all events, lawfully allow them such discriminating contracts without offering the same to the plaintiff. The evidence shows that such contracts were not confined to the two or three neighbors who were proved to hold them, but were extensively given by the defendant.

Nor am I willing to assent to the proposition, under however plausible a guise it may be put, that a public service corporation, i. e., a corporation enfranchised by government to perform what is properly called in Western Union Tel. Co. v. Call Pub. Co., 181 U. S. 100, 21 Sup. Ct. 561, 45 L. Ed. 765, and other cases "a public service," such as the management and running of a public highway, or the furnishing of water and light to the community, may apply the rule that those who ship more freight or take more water or light, shall pay at a less rate than those who ship or take less. In the transportation of freight, parcels may and probably should be charged for at a higher relative rate by weight or size than is charged for large or wholesale quantities, because the former are obviously a class of themselves, and the relative cost of carrying and handling them is greater. But the distinction ends there. No discrimination may be made in respect of parcels as against parcels of the same kind, and none may be made in respect of freight in bulk as against other freight in bulk of the same kind. If the freight in a given case belongs to the class of freight in bulk (and not to parcels or retail quantities), as wheat, for instance, or sugar or hay, that the quantity is less than that of another shipper of the same commodity in bulk does not permit of a larger rate being charged against the former than against the latter. If the rule were the contrary it would allow the large manufacturers or producers to destroy the smaller, for if the former may have their commodities carried on the railroad highways at a lower rate than their smaller rivals, they are thereby enabled to undersell such rivals that much in the markets, and gradually, or, if the discrimination be large enough, all at once, undermine and destroy them, and acquire a monopoly in that line of business. It is time that judicial utterances here and there asserting as a general principle that he who ships or takes more should pay less should be treated as inadvertent. The saying that to him who hath shall be given, but from him who hath not shall be taken away

even that which he hath, should have no sway in the administration of justice, however true it may come in the general greed of the world.

Nor can the rule applicable to common carriers generally in the respect under consideration wholly apply in respect of public service corporations. They have obligations which the ordinary common carrier has not. It needs no argument to show that a corporation which is given the control and management of a public highway stands in a very different position toward individuals, the community and government in respect of rates than ordinary common carriers who are mere users of the public highways, earth, water or rail, like the rest of us. Such decisions as that in Lough v. Outerbridge, 143 N. Y. 271, 38 N. E. 292, 25 L. R. A. 674, 42 Am. St. Rep. 712, are therefore not fully applicable to the case of public service corporations.

In the case of a public service corporation to furnish electric current or gas for light, or the like, it is questionable whether they should be allowed to discriminate at all on the basis of the quantity taken by different consumers in the same locality or district, i. e., a locality or district of consumers all in the same case or condition in respect of being supplied. It may be possible that the use of light for household purposes and for business may be properly classified separately, and a different rate established for each, but in each of the said two classes no discrimination should be permitted. There is no sound reason for such discrimination, and it cannot be put on a safe or just basis. The infinite varieties of freight makes an almost equal variety of rates, viz., a rate for each kind, in transportation; but that does not apply to the case of this defendant. It has only one commodity to deal with. It has to manufacture a gross amount of current for its customers generally, or in given districts, if districts have to be resorted to in localizing and associating those in the same case for the fixing of price. The current taken by a large house or of twenty houses, costs the same the unit in the production as that taken by a small house or one house; and the same is true in respect of a large business establishment as compared with a small one or several compared with one. If the former gets current at cost, or nearer to cost than the latter, the reduction given to the former has to be charged to the latter; or at best prevents to that extent a deduction of price to the latter, for the company must pay its expenses and also make a profit, and for that purpose collect in rates the necessary gross amount. It has the right to make a fair profit out of the community, after paying all of its expenses, and allowing to the full for annual wear and tear, depreciation from age and use. To do this, if it gives a reduced price to some it must make up the difference out of the others.

It is argued for the defendant that if contracts like that questioned here are made, the company can, by taking them all together, be informed in advance of the extent of the demands upon it in the future for current, and in that way be enabled to prepare for it seasonably by enlarging or improving its plant accordingly, and to supply every one better and cheaper. This is not even specious. The company by noting the growth of consumption is informed of future consumption just as thoroughly as though such future consumption, or a considerable portion of it, were actually contracted for in advance. The argu-

110 N.Y.S.—39

ment that such contracts encourage and create a larger consumption, and thereby tend to lower the cost of production, and hence the price to all the consumers, including those who do not make such contracts, is also an economic fallacy. Consumers do not use more because of the contract, but make the contract because they need more, and use more because the price is cheaper; and if the cost of production and therefore the price to the consumer grow less with the growth in production to meet the growing need, the lowest price will be automatically reached with the highest production without resorting to the contracts or to other artificial expedients, which, as experience has abundantly demonstrated, by interfering with the operation of the natural laws of trade, retard its progress. The only difference such contracts make is that the benefit of the growing economy of an increasing production and distribution is given to a comparatively few instead of to all as justice requires. It is not possible in the nature of things to leave such companies to get up schemes for discrimination in prices without leading to favoritism, abuse and injustice, if not corruption also. And if anything is plain, and has been demonstrated by experience, it is that the mere right of each consumer to bring an action to prevent discrimination against him will not prevent the general evil of discrimination. Most people will suffer almost anything sooner than resort to an expensive, difficult and protracted lawsuit. The sound, just and safe rule, and the one which will preclude the possibility of favoritism, is that all consumers in the same district and case be treated alike. It seems that this company connects its mains with the premises of consumers, and furnishes lamps. If the expense of these things varies, then let each consumer pay his own.

An examination of all of the decisions, especially in the light of the development of sound economic thought during the last ten or fifteen years on the question of the status of public service corporations, discloses that nothing is yet settled contrary to the foregoing. In Silkman v. Water Commissioners, 152 N. Y. 327, 46 N. E. 612, 37 L. R. A. 827, the statute under which the water was furnished authorized the discrimination complained of. The off-hand remark of Judge Martin, "Surely, it cannot be said to be unreasonable to provide less rates where a large amount of water is used than where a small quantity is consumed," was therefore his dictum and not the judgment of the court. The proposition does not by any means seem as certain as the learned Judge thought it was eleven years ago, at all events if it was meant as a general rule applicable to the consumers individually and not to them by classes, such as householders and those carrying on business. The law is a progressive science; otherwise it would often curse when it ought to bless. The unanimous decision in Western Union Tel. Co. v. Call Pub. Co., 181 U. S. 92, 21 Sup. Ct. 561, 45 L. Ed. 765, supports the foregoing views. It permits of no difference in charges unless it grows out of a difference in service. After laying down that every one has "equal rights" both in respect to service and charges, it says:

"Of course, such equality of right does not prevent differences in the modes and kinds of service and different charges based thereon. There is no cast iron line of uniformity which prevents a charge from being above or below a

particular sum, or requires that the service shall be exactly along the same lines. But that principle of equality does forbid any difference in charge which is not based upon difference in service, and even when based upon difference of service, must have some reasonable relation to the amount of difference, and cannot be so great as to produce an unjust discrimination."

Instead of pointing out any "difference in service" in the present case, upon which alone a difference in rates may be lawfully based, the defendant only points out a difference between the contract it has with the plaintiff and that it has with those who are charged less than he is.

It may well be that there are districts or localities of the city in which the cost of supplying current (i. e., the producing current to the consumer) is greater than in the plaintiff's district, and it would not be unlawful to charge more for it than the plaintiff and people in his district pay, and other instances might be mentioned; but we have no such case—no case of difference in service, or in cost of service—here.

The judgment should be affirmed.