Argued October 28, 1958, affirmed as modified February 11, petition for rehearing denied April 22, 1959.

## KLIKS ET AL v. DALLES CITY ET AL

335 P. 2d 366

162

*Charles A. Phipps*, The Dalles, argued the cause of appellants and cross-respondents. On the brief were Phipps and Phipps.

*B. A. Kliks*, Portland, argued the cause for respondents and cross-appellants. With him on the brief was Donald H. Joyce.

Before PERRY*, Chief Justice, WARNER, McALLISTER**, SLOAN and O'CONNELL, Justices.

O'CONNELL, J.

This is a suit brought against the defendant city and several of its officers to determine the validity and construction of certain city ordinances fixing water rates under which the plaintiffs were required to pay

---

\* Chief Justice when case was argued.
\*\* Chief Justice when this decision was rendered.

for water used in the Commodore Apartments, an apartment building owned by them. In addition to a prayer that the ordinance be declared void on the ground that it establishes discriminatory and unreasonable rates for water as applied to the use in the plaintiffs' apartment building, plaintiffs request the court to fix a maximum charge for their use of water; that the defendant be enjoined from interfering with such use and that there be an accounting with respect to charges and payments for water from and after January, 1954.

The ordinances in question, which establish the water rate structure, are challenged on two principal grounds; (1) that the inclusion of rooming houses, boarding houses, motels, hotels and trailer courts under a classification distinct from, and under a more favorable rate structure than, apartment houses constituted an unreasonable discrimination, and (2) that the minimum service charge applicable to apartment houses was based upon the use of a quantity of water which so far exceeded the actual use of the water by the plaintiffs' tenants that the charge was arbitrary, unreasonable and confiscatory.

The plaintiffs contend that these ordinances violated the Fourteenth Amendment of the Constitution of the United States and Article I, § 18 and 20 of the Oregon Constitution. The trial court held that the classification established by the ordinances was not discriminatory but that the minimum rates as they were applied to the plaintiffs' property were arbitrary and that therefore the ordinances were to that extent void. The defendants have appealed from that part of the decree which declared void the minimum unit rates as applied to the plaintiffs' property. The plaintiffs cross-appealed from the decree in its entirety.

Prior to October 1, 1953, apartment houses in The Dalles were classified as commercial users of water and were charged for water at a rate of $2.00 a month minimum which entitled the customer to use 7500 gallons of water during that period. All water in excess of 7500 gallons was charged for at the same meter rate per thousand gallons as that charged all commercial users. In October, 1953 the rate structure applicable to apartment houses was changed by the enactment of Ordinance No. 706. This ordinance provided that apartment houses having more than four living units would be charged $2.00 per month minimum rate *for each apartment unit*, which entitled the customer to 7500 gallons of water for each unit.[1]

---

### [1]GENERAL ORDINANCE NO. 706

An Ordinance to amend certain parts of Section 6 of General Ordinance No. 687, as amended, relating to water rates, security deposits, and payment thereof.

\* \* \* \* \*

(d) The following schedule of water rates is hereby established and shall be charged for water supplied by the City:

FLAT RATE (Residential) ¾" TAP:

| | |
|---|---|
| Single Family Residences | $3.00 per month |
| Two Family Residences | 2.50 per unit per month |
| Three Family Residences | 2.25 per unit per month |
| Four Family Residences | 2.00 per unit per month |

(All apartments over four families subject to metered rates.)

## FLAT RATE OVERSIZE CONNECTIONS:

| | |
|---|---|
| 1″ | $4.50 per month per unit |
| 1½″ | 6.00 per month per unit |
| 2″ | 7.50 per month per unit |
| 3″ | 11.25 per month per unit |
| 4″ | 15.00 per month per unit |
| 6″ | 30.00 per month per unit |
| 8″ | 45.00 per month per unit |

METER RATE (Apartment Houses—Commercial):

(1) Apartment Houses with over four residential living units; Metered consumption shall be divided evenly among the various living units, and each unit shall be billed $2.00 minimum for first 7,500 gallons, and the below metered rate for gallonage in excess of the minimum amount used in any one month.

(2) All other non-residential premises—including rooming and boarding houses with facilities for accommodation of more than four persons:

Minimum Charge: $2.00 per month, which shall entitle the user to 7,500 gallons of water during the month.

Water consumed in Excess of the above Minimum:

$ .20 per thousand gallons for next 5,000 gallons
.16 per thousand gallons for next 7,500 gallons
.12 per thousand gallons for above 20,000 gallons during month.

METER RATE (Manufacturing):

This rate shall be available to manufacturing and food processing industries which use in excess of one million gallons of water per month.

The rates for the first one million gallons used shall be the same as that for commercial establishments—the rate for all over one-million gallons of monthly consumption shall be eight cents ($.08) per thousand gallons.

OUTSIDE RATE:

All premises served outside the City Limits shall be metered at one and one-half (1½) times the regular city metered rate.

---

Water in excess of the total minimum amount was charged for at the regular meter rate applicable to commercial users.

A further change was made through the enactment of Ordinance No. 721, which became effective August 5, 1955. Under this ordinance the minimum service charge for 7500 gallons of water per month for apartment houses was changed from $2.00 per unit to a sliding scale of rates per unit based upon the number of units in the apartment house.[2]

---

## [2]GENERAL ORDINANCE NO. 721

An Ordinance to amend General Ordinance No. 687, as amended, by changing the water rates applicable to certain multi-family residences and apartments.
* * * entitled "An Ordinance providing for the administration of operation of the Water Department of Dalles City, providing for meters, deposits and City water rates," passed June 4, 1951, and approved June 5, 1951, * * * be and the same hereby is amended to read as follows:
* * * * *

METER RATE (Multi-family residences and apartments over four units):

(1) Multi-family residences and apartment houses with over four residential living units: Metered consumption to a multi-family residence or apartment house shall be divided equally among the various living units, and each multi-family residence or apartment house shall be billed the minimum applicable unit rate set forth below for the first 7,500 gallons allocated to each unit, plus the

metered water consumption rate set forth in subparagraph (2) hereof for water used in excess of the minimum on the entire premises in any one month:

| | | |
|---|---|---|
| (a) | Five units | $1.75 per unit minimum |
| (b) | Six units | 1.50 per unit minimum |
| (c) | Seven through eleven units | 1.25 per unit minimum |
| (d) | Twelve through fifteen units | 1.15 per unit minimum |
| (e) | Sixteen through twenty units | 1.10 per unit minimum |
| (f) | Twenty-one units or more | 1.00 per unit minimum |

(2) All other non-residential premises, but including rooming, boarding houses, hotels, motels and trailer courts with facilities for accommodation of more than four persons:

Minimum Charge: $2.00 per month, which shall entitle the user to 7,500 gallons of water during the month.

Water consumed in Excess of the Above Minimum:

$ .20 per thousand gallons for next 5,000 gallons
.16 per thousand gallons for next 7,500 gallons
.12 per thousand gallons above 20,000 gallons during month.

---

Plaintiffs' apartment house was treated by the defendant city as consisting of 70 units although not all of these units were apartments, there being six business establishments on the first floor (which, however, used water) and three rooms above the first floor which had no water facilities. The water enters the building through a two-inch tap. All of the water used in the building is measured by one meter. Since the apartment contained more than 20 units, it was

entitled to the minimum rate of $1.00 per unit under Ordinance No. 721. On the basis of 70 units plaintiffs were entitled to 525,000 (70 x 7500) gallons of water per month at a minimum rate of $70.

Prior to the enactment of Ordinance No. 706 plaintiffs' water bill was approximately $21 per month; after its enactment and enforcement plaintiffs' monthly bill for water was $140 (70 x $2.00). After the enactment of Ordinance No. 721 plaintiffs' monthly bill for water was $70. There was an additional sewage charge in each case.

Plaintiffs contend that because of the great disparity between the quantity of water which they are required to pay for under the minimum rate and the amount of water actually used by them, the rate is unreasonable, arbitrary and confiscatory.

■ Plaintiffs admit that during the years 1951, 1952 and 1953 the monthly use in the Commodore Apartments ran as high as 400,000 gallons per month. Upon the basis of incomplete records for the period from March, 1954 to June, 1956 the average monthly consumption would approximate 260,000 gallons, the monthly gallonage ranging from 138,000 to 348,000 during that period. If we should accept 260,000 gallons as the monthly average, the actual use of water by the plaintiffs would be approximately 50% of the minimum gallonage of 525,000 for which they were charged. Standing alone, this would appear to impose upon the plaintiffs an unreasonable charge. But a determination of the reasonableness of the rate cannot be arrived at simply by making such a comparison. In the first place, it is eminently clear that a charge for water need not be based entirely upon the amount of water actually used. It is a common and legally accepted practice to fix minimum rates which a customer must

pay even though he uses less than the minimum amount of water for which the charge is made. This minimum rate is in effect a service charge for those customers who use less than the minimum amount, differing only from a fixed service charge unrelated to a minimum quantity of water in that under a minimum rate the charge is absorbed when the minimum quantity of water is used. *City of Rochester v. Rochester Gas and Electric Corp.*, 233 NY 39, 45, 134 NE 828, 830 (1922). The purpose of the minimum bill is explained by Mr. Justice Cardozo as follows:

"* * * a minimum bill * * * differs from a service charge in this only, that the charge is absorbed and disappears when the minimum is reached. For the man who does not take anything, or less than the amount prescribed, the two devices are the same." *City of Rochester v. Rochester Gas and Electric Corp.*, supra at p 45, 134 NE 828, 830.

The purpose of a service charge was well explained in the same case:

"* * * Some [expenses] remain constant whether consumers are few or many. Others increase or diminish at a uniform rate with the number of patrons. A service charge is an attempt to make the incidence of the burden as wide as the incidence of the benefit. From all the items included in the cost of distribution it segregates, and divides per capita, those dependent upon numbers. Such items there always are. Whenever a building is connected with a main, there is expense which continues while the connection is maintained. This expense will be the same though only a trifling quantity of gas, or even none at all, is used by the householder * * *. * * * there is the benefit of facilities, which would otherwise be needless, without contributing to the cost of supplying or maintaining them. The householder who closes his dwelling for the summer, and pays nothing in the interval, shifts the cost of maintenance incurred in his behalf to the house-

holder, whose dwelling is open throughout the year. The occupant who pays something, but not enough to pay his share of the expense, is carried by his neighbors when rates are increased to compensate for profitless accounts. Sometimes this result is avoided through the device of a minimum bill * * *." *City of Rochester v. Rochester Gas and Electric Corp.*, supra at p 44-5, 134 NE 828, 830.

Although there is no agreement as to what costs should be included in fixing the so-called service charge, the recovery of two types of costs is normally contemplated; (1) the expenses incident to the service of customers in maintaining and reading meters, in keeping customer's accounts and billing them each month, in repairing pipes and other equipment used exclusively in furnishing customers with the service, and similar expenses; (2) the expenses incident to the maintenance of the plant so that the utility has the capacity to supply its customers whenever there is a demand for the commodity being furnished, embracing items of capital outlay for plant and equipment, and operating and other expenses relating to the utility plant as a whole. Here expenses are incurred in constructing and maintaining a plant which can meet the customer's potential use. The charge to recover these costs is sometimes called a readiness-to-serve charge. *Lewis v. Mayor and City Council of Cumberland*, 189 Md 58, 71, 54 A2d 319, 325 (1946); see also Havlik, Service Charges In Gas and Electric Rates (1938).

■ It is apparent then that the plaintiffs do not prove that the rate applicable to them is unreasonable simply by showing that their *average* consumption is less than the minimum set for their property.

"* * * The capital investment necessary to serve a customer is not limited by his average consumption, but must include water supply and mains suf-

ficient to supply his *maximum* use \* \* \*." *Lewis v. Mayor and City Council of Cumberland,* supra at p 71, 54 A2d 318, 325.

The plaintiffs introduced evidence which revealed that they used 348,000 gallons of water during the month of September, 1955 and in their brief they state that during the years 1951, 1952 and 1953 they used as much as 400,000 gallons per month. The consumption in April, 1952 was 420,000 gallons. In the operation of its water plant, the defendant city would have to maintain facilities to accommodate this demand and possibly a higher demand for water by the plaintiffs and other apartment owners. Seen in this light, the disparity between the quantity of water used and the minimum specified in the rate structure is not as great as plaintiffs assert.

■ Further, we cannot look at plaintiffs' demands alone in testing the reasonableness of the rate. It would be within the power of the city council in constructing a schedule of rates to calculate the average demands per unit of all the apartments in the city taken together. In arriving at the estimated average amount of water which would be consumed in all apartments as a class, it would be permissible to take into consideration the use of water for the irrigation of apartment house lawns, common laundry facilities, automobile washing facilities and other types of use which some, but not all, apartment houses will require. If the inclusion of such demands in computing the average increased the minimum set by the city, the plaintiffs could not complain merely because they did not happen to need water for all such purposes. The establishment of a rate structure does not require that the components used in creating it fit all persons within the class exactly alike.

■ To be entitled to relief the plaintiffs must establish that the quantity of 7500 gallons per unit per month for which the minimum rate is charged, is so large in relation to the potential consumption per unit, not only in plaintiffs' apartments but in other apartments in The Dalles, that the rate is unreasonable. The burden of showing that the charge is unreasonable rests upon the plaintiffs.

■ The defendant city has the power to fix the rates to be charged for water which it sells. ORS 225.-020, Laws, 1899, p 1008 (Dalles City Charter), Ch XIII, p 1041 (as amended), *Gates v. Public Service Commission*, 86 Or 442, 167 P 791, 168 P 939 (1917). In doing so it acts in a legislative capacity. Rhyne, Municipal Law § 23-7, 3 Yokley Municipal Corporations § 503, *Jarrett v. Boston*, 209 Ga 530, 74 SE2d 549, 40 ALR2d 1327 (1953). There is a strong presumption that the city, in exercising this function, acts within the bounds of reasonableness, and in the absence of evidence clearly establishing that the rate fixed is unreasonable, we have no power to set it aside. Rhyne, loc. cit., 2 Antieau Municipal Corporation Law § 19.03, *Mitchell v. City of Mobile*, 244 Ala 442, 13 So2d 644 (1943).

■■ Rate making for public utility service is a complex procedure. There is a wide variety of opinion among those who are experts in the field as to the appropriate factors which should be used in establishing a rate structure. Water Rates Manual, American Water Works Association (1957). Unless its action is arbitrary and unreasonable, the city is free to adopt the point of view which it sees fit in making up its water rates and it is not for us to tell the city that its choice is unwise. *Jarrett v. City of Boston*, supra. Upon the basis of the evidence submitted by the plaintiffs in this case, we are unable to say that the disparity be-

tween the minimum quantity set under the rate structure and the amount of water necessary to supply plaintiffs' actual or potential demand renders unreasonable the rates established by the defendant city.

We have not been furnished with detailed financial data with respect to capital outlay, costs of operation, replacement, expansion and other costs from which we could even approximate the rate which the defendant city would have to charge to recover its outlay and earn a fair profit. The plaintiffs introduced into evidence audit reports of the defendant city's water plant operation for the years 1950-1956 inclusive, but these reports, even when supplemented by other evidence relating to the cost of maintaining and operating the city water works, do not provide us with the data necessary to calculate or approximate a reasonable rate for the service supplied. The record lacks other data which would be essential to an appraisal of the rate structure prepared by the city. See 48 American Water Works Association Journal 465; 50 ibid. 912; 42 ibid. 981.

■ The plaintiffs contend that the defendant city is in "excellent financial condition." The city answers by showing a deficit of $134,000 during the years 1953, 1954 and 1955 in the operation of its water plant, which was one of the reasons it had to increase the water rate structure. The city decided upon a program of plant repair and expansion which eventuated in the issuance of $250,000 general obligation and revenue water bonds of Dalles City. The money needed to retire these bonds was to be obtained in part at least from the revenue produced by the increased water rates. Running through plaintiffs' brief is the intimation that the city's decision to expand was unwise and therefore the expense in financing such expansion

should not be visited upon the plaintiffs in the form of increased water rates. This, and other questions of policy were for the city acting in its legislative capacity in fixing the rates, and it is not the function of this court to say whether the city council's action was or was not wise.

 It is further contended by the plaintiffs "that the city cannot * * * fix the rates * * * on the profit that a private party may make * * *." ORS 225.020 authorizes a city to operate a waterworks "for profit." We construe this to mean that the city is entitled to sell its water at a price which will yield it a reasonable return on its investment. In other words, for this purpose the city may be viewed as a private corporation engaged in the sale of water for profit. As was said in *Simon v. City Council of Charleston*, 181 SC 353, 187 SE 545 (1936):

> "* * * A municipality may charge a rate that will yield a fair profit, just the same as a private corporation. The fact that it makes a profit does not show that the rate is unreasonable." 181 SC 353, 358-359, 187 SE 545, 547.

This is in accord with the majority rule. See Rhyne, op. cit. supra, § 23-7 N. 5, *Shirk v. Lancaster*, 313 Pa 158, 169 A 557, 90 ALR 688 (1933).

If a municipal utility's rates are no higher than those charged in comparable situations under private ownership, there is a strong argument for permitting it to earn more than the return which a private utility would be entitled to earn. Groves, Financing Government (1950) p 398 et seq.; Electric Power and Government Policy (1948) p 420; cf. Wiedner, American City Government (1950) p 208-209.

It is our conclusion, then, that the plaintiffs have not shown that the multiple minimum rate is unreasona-

ble merely because it sets a minimum monthly apartment unit charge for 7500 gallons of water.

We turn now to plaintiffs' second principal contention. It is urged that even though the rates applicable to them are regarded as reasonable in terms of their use and demand for water, and that such rates may be reasonable vis-a-vis other apartment owners, there is undue discrimination in classifying differently in the rate structure the use of water for apartment house purposes and the use of water in hotels, motels and other similar uses. It will be noted that under Ordinance 721 the minimum charge for rooming houses, boarding houses, hotels, motels and trailer courts with facilities for the accommodation of more than four persons is $2.00 per month, which entitles the owner to 7500 gallons of water during the month. The minimum charge is not made separately for each unit under this classification, the user paying for the water on the basis of metered rates after the minimum of 7500 gallons is consumed.

A comparison of the cost of 525,000 gallons of water per month under each of the two classifications will indicate the difference in the effect of the rates. The use of 525,000 gallons of water by an apartment owner with 70 units would result in a charge of $70.00. A hotel using the same quantity of water would pay $64.80. The difference in cost is more striking if the apartment house owner were to use only a part of his minimum. Thus, if an apartment owner with 70 units should use a total of 260,000 gallons of water per month (which was the approximate average amount actually used by the plaintiffs) his cost would remain at $70.00, but the hotel owner would pay only $33.00. There is, then, a substantial difference in treatment between these two classes of users and we must decide whether this difference can be justified.

■ A municipal utility is entitled to make differentiations in the rate charged for water if those differentiations are based upon a proper classification. *Gillam V. Fort Worth,* 287 SW2d 494 (Tex Civ App 1956); 2 Antieau Municipal Corporation Law § 19.03, 3 Yokley Municipal Corporations § 503, Rhyne Municipal Law § 23-8.

■ The defendants are favored with a presumption that the classification is not discriminatory.

> "Whether differences in rates between classes of customers are to be made, and, if so, the amount of the differences, are legislative rather than judicial questions, and are for the determination of the governing bodies of the municipalities. The presumption is in favor of the legality of the rates established by the rate-making authority, and courts may interfere only in clear cases of illegality. Knotts v. Nollen, 206 Iowa 261, 218 NW 563. The burden of proof is upon the party alleging that the * * * difference in rates is disproportionate to the difference in conditions." *Gillam v. City of Fort Worth,* supra. See also *Jarrett v. Boston,* 209 Ga 530, 74 SE2d 549 (1953), 40 ALR2d 1327.

■ If, however, these differences in conditions cannot be shown then all customers are entitled to receive the same service on an equal basis and at a uniform rate.

> "* * * when various patrons or classes of patrons demand a commodity in equal amounts and of the same quality and under the same rules and regulations as to furnishing, delivering and supplying the same, then the charge for such commodity should be the same to all purchasers." *Garner v. Tulsa Ice Co.,* PUR 1917 C 613, 626. See also *Arkansas Natural Gas Co. v. Norton Co.,* 165 Ark 172, 263 SW 775 (1924), 1 Pond Public Utilities (3 ed) § 279.

This requirement of equality of treatment in the absence of significant differences applies to the cus-

tomers of utilities operated by municipal corporations. *City of Montgomery v. Greene,* 180 Ala 322, 60 So 900 (1913); *City of Malvern v. Young,* 205 Ark 886, 171 SW2d 470 (1943); *Western Reserve Steel Co. v. Village of Cuyahoga Heights,* 118 Ohio St 544; *American Aniline Products, Inc. v. City of Lock Haven,* 288 Pa 420, 135 A 720; 1 Pond Public Utilities (3 ed) § 280.

■ The differences upon which the classification is predicated must have a reasonable relationship to the purpose for which the classification is made. As stated in *Ex Parte French,* 315 Mo 75, 285 SW 513 (1926):

> "A classification for legislative purposes must rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed." 315 Mo 75, 82, 285 SW 513, 515 (1926).

Insofar as municipal utility rates are concerned, this means that a difference in rates must find justification in "a difference in conditions of service * * *." *Jarrett v. City of Boston,* supra at p 551; *Louisville and Jefferson County Metropolitan Sewer District v. Seagram,* 307 Ky 413, 211 SW2d 122 (1948); *American Aniline Products, Inc. v. Lock Haven,* supra; *City of Texarkana v. Wiggins,* 151 Tex 100, 246 SW2d 622 (1952), Rhyne, Municipal Law § 23-8.

■ It is not enough simply to point to a difference of any kind between apartment houses and hotels; the dissimilarities must be those which will justify a difference in the charge for the water supplied. The fact that certain of the differences may constitute a valid basis for classifying the two differently in the imposition of a tax burden, as would be true, for example, of a room tax due to the more permanent nature of apartment tenants compared with the transient patronage of a hotel, does not necessarily mean that these same

differences will be sufficient to warrant an unequal charge for utility service. Although a city may operate its utility for profit and may use the profit for any purpose it sees fit within the powers granted to it, the prices which it charges various customers for water or other utility service must be related to its function as a seller of a commodity or service and not to its function as a taxing authority. *Mitchell v. City of Mobile*, 244 Ala 442, 13 So2d 664 (1943); *Chicopee Mfg. Co. v. Manchester Board of Water Commissioners*, 97 NH 109, 81 A2d 837 (1951); *Re City of Bozeman*, 18 PUR3d 180 (1957). In this sense, a city operates in a proprietary capacity. *Feil v. City of Coeur D'Alene*, 23 Idaho 32, 129 P 643 (1913); *Pabst Corporation v. City of Milwaukie*, 193 Wis 522, 213 NW 888 (1927); cf. *Esberg Cigar Co. v. City of Portland*, 34 Or 285, 55 P 961 (1899); *Tone v. Tillamook City*, 58 Or 382, 114 P 938 (1911).

Guided by these principles, we must determine whether the classification under the ordinances in question is reasonable. The defendants argue that an apartment house is in effect a group of residences under a single roof, and that therefore the units in the apartment building may be treated as separate residences in making up a water rate schedule. But it is not enough to show the *similarity* between the occupancy of apartment units and occupancy of separately roofed dwellings. As already stated, a valid classification must be based upon substantial *differences* and, since it seems clear that the operation of an apartment house is at least prima facie a commercial use of property, *Philadelphia Suburban Water Co. v. Pennsylvania Public Utilities Commission*, 164 Pa Super 320, 64 A2d 500 (1949), and see 35 PUR(NS) 129, 132, we must therefore seek differences which will justify

drawing a line between the plaintiffs' use and other commercial uses of property in the city.

■ How then, can the plaintiffs' apartment house be distinguished from a hotel, a motel and other commercial enterprises which are favored with a lower rate? It has been noted that "* * * distinctions based upon the amount of patronage, distance, location, the expense of delivery, etc., have many times been sustained." Antieau Municipal Corporation Law, § 19.03. But the use to which the water is put by the various consumers is not, standing by itself, sufficient to justify a difference in rates. 1 Pond Public Utilities § 295.

> "* * * A classification based on a particular business or use for a special purpose will not, without more, justify classification or discriminatory rate." *American Aniline Products, Inc. v. City of Lock Haven*, 288 Pa 420, 426, 135 Atl 726 (1927); cf. *Bailey v. Fayette Gas-Fuel Co.*, 193 Pa 175, 44 Atl 251 (1899); *Westerhoff Bros. Co. v. Ephrata Borough*, 283 Pa 71, 128 Pa 656 (1925).

This same idea has been expressed frequently in cases before public utility commissions.

> "* * * the present rates are indefensible in that they are based on varying prices according to the use made of the current which costs the company the same whether the electricity is used for light, power or heat." *Re Green Mountain Power Corporation*, PUR 1930 B, 171, 174.

> "* * * If distinctions are to be made which result in different charges for a commodity, such distinction or difference should be based upon the quality of article demanded and the amount of service necessary to supply the same, rather than upon the profession or occupation of the purchaser." *Gardner v. Tulsa Ice Company, et al*, PUR 1917 C 613, 626.

"* * * Unless it costs a utility less to serve a given class of customers, it does not seem proper to us that they should be given any special rate treatment based simply on character of use." *Re Springfield Gas Light Co.*, 1 PUR3d 65, 82 (1954). See also *City of Erie, et al. v. Pennsylvania Gas Company*, PUR 1920 B, 396 (1920); *Plansifter Milling Company v. Oklahoma Gas & Electric Company, et al.*, PUR 1916 A, 208 (1915); *Re New York State Electric & Gas Corporation*, 6 PUR(NS) 113.

And so it has been held, that in the absence of differences relating to supplying the services, it is unjust discrimination to charge one rate to stockyards and railroads and another rate to laundries (*Model Laundry Co. v. East St. Louis & Interurban Water Company*, PUR 1918 D, 132); or one rate to general manufacturers and another rate to laundries (*State ex rel. Laundry, Inc. et al. v. Public Service Commission, et al.*, PUR 1931 B 376; *State v. Public Service Commission*, 327 Mo 93, 34 SW2d 37 (1931); or one rate for laundries and restaurants and another rate to domestic and other consumers. (*In Re Murphy Water Ice & Light Company*, PUR 1916 B 719).

The defendants have called to our attention cases holding that the use of water in apartment houses may be classified as a residential use for rate making purposes. The holdings in these cases are based on grounds of both similarities and differences between the types of property classified. We have examined these cases carefully, and conclude that they are not persuasive.

In *Knotts v. Nollen*, 206 Iowa 261, 218 NW 563 (1928) the city established a schedule of rates which classified apartment house units as separate residences. This resulted in denying to apartment house owners the benefit of a sliding meter rate which was given to hotels, department stores and other com-

mercial users. The court held that the classification did not constitute an unlawful discrimination against apartment owners. In doing so, the court noted that water consumers in an apartment house are the families and not the proprietor and that to classify an apartment house as a quantity consumer would be to discriminate in favor of such families and against families occupying dwellings under separate roofs. It was also noted that the city had no control over the charges which the apartment house owner could impose upon the tenants for the use of the water.

This argument is deceptively appealing. Unquestionably, there are similarities between the manner in which apartment tenants and those in separate dwellings use water. But the important consideration is not the similarities between these two types of use of water, but the differences, if any, between apartment houses and hotels, motels and other commercial users to whom a lower rate is charged.

In *Knotts v. Nollen*, supra, the court attempted to make out such differences, pointing out that tenants in apartment houses,

"* * * are families, who maintain their family solidarity and seclusion and carry on their housekeeping, including water consumption, in quite the same manner as if residing in separate dwellings. Water to an apartment house is supplied to several or many families for separate and household consumption. Water is supplied to hotels and office buildings largely for individual and a more limited and intermittent consumption." 260 Iowa 261, 263, 264, 218 NW 563, 565.

Granting that all this is true, it amounts to no more than a distinction based on the ultimate use of the water—"housekeeping" in one case, "individual" in the other. But as we have seen, a distinction based

solely on the nature of the use will not sustain a rate classification. For rate making purposes, we are unable to see any difference between the service to a hotel and an apartment house where, as here, each is served by the utility in the same manner and no other factors such as the quantity used, the time of use, etc. might permit rate differences. The water is furnished to both through one pipe. Only one meter need be read and one bill prepared; there is only one connection to service and maintain. It simply cannot be said that the apartment house is different in any material respect from a hotel or other commercial user, nor can it be said that it is the same as a collection of residences, each one of which requires separate connections, meters and accounts.

In *Lewis v. Mayor and City Council of Cumberland*, 189 Md 58, 54 A2d 319 (1947), the court sustained a rate classification similar to that imposed by the defendant city in the case at bar. In that case, the plaintiff apartment owner argued that the per customer cost of serving him was no greater than the cost of serving one family through a separate meter in a multiple family dwelling. He also argued that an apartment house is a business and should receive the same rate as other businesses. The court held that the minimum service charge based upon the number of units in the apartment house was not unreasonable, and that treating the apartment house as an aggregation of dwellings rather than as a business in making up the rate classification was permissible. The court, as in *Knotts v. Nollen*, supra, was concerned with what it considered the unfairness which would result to single dwellings if the classification were not sustained.

"* * * It would, however, seem unjust to small consumers in single or multiple family dwellings

to make them the same 'minimum service charge' as an apartment house, however large, however small the average consumption of each apartment, and however large the potential or maximum consumption of all the apartments at any one time, and also to give the apartment house a lower consumption rate because of the number of apartments and the consequent large aggregate consumption of many small consumer tenants." *Lewis v. Mayor and City Council of Cumberland,* 189 Md. 58, 70, 54 A2d 319, 325.

We do not think that it would be "unjust" to classify separately these two types of water use for rate making purposes in view of the differences in service as indicated above. The same type of argument advanced by the court in the Lewis case could be used to prove that it would be "unjust" to charge apartment houses one rate and charge a hotel a different and more favorable rate. The court said that it was not unreasonable to classify separately apartment houses and hotels. But the complainant did not put into evidence the rates charged hotels and other commercial enterprises and consequently the court was not called upon to compare the respective financial burdens imposed upon apartment house owners and hotel owners. Had it done so it would have been forced to deal with the crucial question as we see it, that of reconciling a difference in rates for service which is essentially the same in each case.

In *Caldwell v. City of Abilene,* 260 SW2d 712 (Tex Civ App 1953), an ordinance establishing a multiple minimum charge for apartment house use under a residential classification was sustained. A more favorable rate was enjoyed by hotels, motels and tourist camps catering to itinerant trade. The court said that the city had a right to classify consumers under a

reasonable classification "based upon such factors as the cost of service, the purpose for which the service or product is received, the quantity or amount received, the different character of service furnished, the time of its use or any other matter which presents a substantial difference as a ground of distinction," 260 SW2d 712, 714. However, the court made no effort to apply these factors to the case before it. We believe that if it had attempted to do so, it would have found no real differences in the service to the two classes of consumers which would warrant a difference in rate. The court admitted that the rates resulted in discrimination, but concluded that the discrimination was justifiable.

The three cases last discussed appear to be the only adjudicated cases dealing with the reasonableness of a rate classification similar to the classification before us, and in each case the classification was upheld.

We think that these cases were improperly decided. We recognize the right of a municipality to make reasonable classifications in creating rate structures for utility service; we recognize that the municipality should have the greatest possible freedom of judgment in making such classifications; and we are not concerned with the soundness of its judgment. But this does not mean that every distinction made by the city in creating a rate structure must be accepted by us. The distinctions drawn must be more than word choices unrelated to the purposes which the classification is designed to serve. Our task is to test the classification for its reasonableness. Reasonableness here means that the distinction made can be justified in light of the purpose for which it was created. The service rendered to these various customers by the city is not significantly different. In each case, the water is fed

to the building through a single meter; a single account is kept for each customer; a single monthly billing is made to each of them; in each case the responsibility upon the city for repairs, replacement and service is essentially the same. In the language of *Ford v. Rio Grande Valley Gas Co.*, 141 Tex 525, 174 SW2d 479 (1943), "the material billing factors are substantially the same." 141 Tex 525, 527, 174 SW2d 479, 480. If they are substantially the same for the customers placed in separate classes, the classification cannot be sustained. If the material billing factors are different, a classification based upon such differences is satisfactory. These factors may include the quantity used, the time of use, the manner of service, or any other factor relating to the cost of furnishing the service. *American Aniline Products, Inc. v. City of Lock Haven*, 288 Pa 420, 135 A 726 (1927), 50 ALR 121; *Bilton Machine Tool Co. v. United Illuminating Co.*, 110 Conn 417, 148 A 337 (1930), 67 ALR 814; *Kolb Cleaning & Tailoring Co. v. Mississippi Power & Light Co.*, 166 Miss 136, 145 So 910 (1933); *Garver v. Edison Electric Illuminating Co.*, 126 App Div 371, 110 NY Supp 603 (1908).

There are many distinctions between an apartment house and a hotel; distinctions based upon the nature of occupancy, the character of service offered, the manner in which facilities are used. Such distinctions might very well be the basis for a classification under which apartment house owners would be required to pay one tax and a hotel owner another, because the differences pointed out could be regarded as justifying a difference in the tax base. But in imposing charges for water, the distinctions are not important unless they can be pointed to as a reason for imposing a different cost on persons in the two classes established.

This the adjudicated cases dealt with above failed to do. We are unable to relate the differences in use, the manner of occupancy and other differences relied upon in those cases, to the service supplied. We, therefore, hold that the classification is unreasonable.

The trial court held that the classification of the plaintiffs' apartment house as an aggregation of residential living units rather than as a single commercial unit was valid, but that the unit rates under Ordinances No. 706 and No. 721 as they applied to plaintiffs' property were unreasonable. It is our conclusion that the rates charged the plaintiffs were not shown to be so excessive as to be unreasonable, but that they are unreasonable because the classification is arbitrary. The decree of the lower court will be modified to conform to the views expressed in this opinion. As so modified, the decree of the lower court is affirmed.