# DAVID J. LEWIS *v.* MAYOR AND CITY COUNCIL OF CUMBERLAND

[No. 151, October Term, 1946.]

60

*Decided July 8, 1947.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*D. Lindley Sloan* for the appellant.

*Charles Z. Heskett* for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal by plaintiff from a decree, dated November 26, 1946, dismissing the amended bill and rescinding a restraining order in a case instituted in 1925. The case is a controversy over water rates. Plaintiff is the owner of an apartment house, built by him in 1923, containing thirteen apartments. The building is supplied, through one service line, with water measured by one meter. The question is whether defendant is entitled to charge plaintiff a "minimum service charge" of $4.50 per quarter for 15,000 gallons or less (*a*) for his entire apartment house or (*b*) for each of the thirteen apartments. Until 1936 this was primarily a question of construction of successive rate ordinances. This

question of construction was decided in favor of plaintiff and is not before us. In 1936 the existing rate ordinance was amended by an ordinance which clearly expresses defendant's contention. The question presented therefore is whether the ordinance of 1936 is lawful and valid or is unlawful and void because unreasonable or arbitrary. The case was heard on bill, answer and an agreed statement of facts. It was agreed that the court should "consider any facts alleged in the bill or answer" which in its opinion may be "helpful in arriving at a conclusion" relating to the law of the case.

The Act of 1933, ch. 42, sec. 56, subd. A, provides that defendant shall operate its water system and charge and collect for the water supplied "a sum sufficient to pay the operating expenses of said water system, to pay the interest on and the redemption of all bonds * * * and * * * other indebtedness of said city issued * * * or incurred for the building, extension, operation or maintenance of its water system"; it is its duty "to establish from time to time such rates for its water system as will pay for all operating expense and all its annual interest, and meet all its sinking fund or serial bond requirements; and in case of any deficit in the operations of the water department, then the water rentals shall be increased in order to prevent any future deficit, and to liquidate the past deficit." The Act of 1922, ch. 10, sec. 1, which authorized issuance of Water Improvement Bonds, provides that "at the end of each fiscal year, any excess of receipts over expenses in the water fund, in said year shall be paid" into the sinking fund for the redemption of water bonds. Plaintiff regards the Act of 1933 as prescribing not merely a minimum for rates to maintain solvency of the water department, but also a maximum which prohibits operation for profit. Assuming, for sake of argument only, that this is the proper construction of the statute and also that the court might properly order a general rate reduction to prevent operation at a profit, we find no factual basis

for such action. Defendant says there is now invested in its water system $4,872,110, upon which "investment" (present value not stated) its "excess of water operating revenues" over actual operating expenses, without provision for depreciation [except indirectly through the sinking fund], for the fiscal years 1935 to 1945, inclusive, aggregated about $400,000, including about $231,000 for the last three years; "the net return upon the capital investment" during any of these years [except apparently 1945] did not at any time exceed two per cent.; by deferring maintenance and repairs because of scarcity of materials and labor during the last three years the "excess" for these war years was inflated, and for subsequent years presumably will be correspondingly diminished; the "absolute necessities of the people" require capital additions which will cost about $1,700,000 and may require increased water rates. At March 31, 1944, the end of the fiscal year 1944, after "distribution to sinking fund," in accordance with the Act of 1922, of more than the total "net water operating income" for the year ($54,214), the accumulated balance in the "operating surplus account" was $141,674. In these past results and future prospects we find no evidence of past or probable future operation at any substantial "profit," beyond moderate provision to insure solvency and protect the city's credit. Furthermore, if rates were reduced to avoid profit, the whole of such reduction could not reasonably be given to apartment house owners.

Before 1920 all rates apparently were "flat rates," based on the number and kind of fixtures, *i.e.,* on potential use, not actual use. By an ordinance of 1920 it was provided that in the case of certain classes (since 1924 apparently all classes) of consumers, the consumer or the city might, at his or its election, place a meter on his property. An ordinance of 1924 fixed meter rates at "15,000 gallon per quarter—$4.50" and proportionately for 22,500 ($6.75), 30,000 ($9.00) and so on up to 90,000 gallons ($27), with lower rates for more than 90,000. An ordinance of 1932 provided that "where two

or more families occupy the same dwelling, the same not being an apartment building, water rent will be charged to each family for domestic purposes," and that meter rates should be "15,000 gallons or less per quarter 30c per 1,000 gallons," with lower rates for more than 15,000 gallons. An ordinance of 1934 re-enacted these quoted provisions, and reduced the rates for more than 500,000 gallons. An ordinance of June 1, 1936 provides: "The owner or owners of any apartment house now or hereafter serviced with water from the City of Cumberland, shall be compelled to install at least one meter upon the premises, or, if the owner shall so elect, the owner may have installed a meter for each apartment in the building. In the event the owner shall elect to install but one meter, then the minimum service charge for said apartment building shall be the minimum service rate as fixed by other City Ordinances from time to time, multiplied by the number of apartments contained in each separate apartment house or building." The validity of the sentence last quoted is now at issue.

It might perhaps be doubted whether a rate of "15,000 gallons or less per quarter 30¢ per 1,000 gallons" imposes a "minimum service charge" of $4.50 for less than 15,000 gallons. The record does not contain in full the rate ordinances prior to 1936. However, in view of the language of the prior ordinance of 1924 and the subsequent ordinance of 1936, the reenactment in 1934 of the language of the 1932 ordinance, and the uniform construction of all these ordinances by the city and its consumers, it seems clear that "15,000 gallons or less per quarter 30¢ per 1,000 gallons" does amount to a "minimum service charge" of $4.50 per quarter for 15,000 gallons *or less*. Plaintiff does not dispute this construction, but only the application of the $4.50 minimum to each of his thirteen apartments, instead of his entire building.

For the six months ended September 30, 1944, the "money charged to meters" for domestic consumers ($88,231) was equivalent to more than 34¢ per 1,000

gallons for all "gallons charged against" these meters (256,147,500). In other words, the 6,577 domestic metered consumers used an average of less than 15,000 gallons per quarter and paid $4.50, the price for more than they actually used. These 6,577 consumers must have included many who used more and paid proportionately less than the average, and many others who used less and paid more, *e.g.*, many small consumers among the 2,209 families in multiple family dwellings and tenants of apartments. Since plaintiff's thirteen apartments in the aggregate (but not each of the thirteen) always use more than 15,000 gallons, plaintiff's contention in effect is that he should pay no "service charge" at all, but should only pay for water actually used, at an average rate less than 30¢ per 1,000 gallons. If plaintiff's contention is sustained, thirteen families living in separate houses or in multiple family dwellings, using the same quantities of water as plantiff's thirteen tenants, would continue to pay thirteen "minimum service charges" of $4.50 each, making their average rate for actual consumption more than 30¢ per 1,000 gallons. Plaintiff contends that failure to make such discrimination in his favor is unjust discrimination against him because (*a*) the per customer costs (*e.g.*, meter-reading, billing, collection, service pipe and meter expenses) of serving a large apartment house through one service line and one meter are no greater than the costs of serving one family through a separate meter in a multiple family dwelling; (*b*) in many other cities only one minimum charge is made for an apartment house served by a single meter; and (*c*) an apartment house is a business and is treated differently from all other businesses.

In *Home Owners' Loan Corporation v. Baltimore*, 175 Md. 676, 680, 3 A. 2d 747, 749, the court said: "It is axiomatic that a public service corporation, private or municipal, is under a duty to furnish to all persons applying therefor the service which it offers without discrimination and at reasonable rates, where the service

requested is within reasonable range of its plant, equipment, lines or mains. *Dillon on Mun. Corp.*, 5th Ed., sec. 1317; *McQuillin on Mun. Corp.*, sec. 1946n, secs. 1821, 1829; 51 *C. J.* 7; *Merryman v. Baltimore,* 153 Md. 419, 427, 138 A. 324. Where the service or utility is supplied by a municipality, it has been said that while the purpose must be public and the utility must be impressed with a public interest, nevertheless the municipality acts in its business or proprietary rather than its governmental character, (*McQuillin on Mun. Corp.*, sec. 1946; 43 *C. J.* 420; *Wagner v. Rock Island,* 146 Ill. 139, 34 N. E. 545, 21 L. R. A. 519), and that is especially true where the service is supplied beyond the territorial limits of the municipality. *Dillon on Mun. Corp.*, secs. 1299, 1300." Though the municipality may act in its "business or proprietary character," in the instant case it is the only governmental authority which has ratemaking powers. With an exception not applicable to Allegany County, Art. 23, sec. 414, 1939 Code and 1943 Supplement, the Public Service Commission has no power over municipal water rates. *Cf.* secs. 345, 401, Code 1939, Art. 23, as to gas and electric rates. The municipality has all the powers of an owner to initiate rates and classification of rates, and perhaps also the equivalent of the usual powers of an administrative body to regulate and make rates and classifications. The courts are not managers of municipal utilities and have no ratemaking powers. They have, at most, in the absence of administrative ratemaking bodies, (*a*) the powers they had at common law with respect to unreasonable or unjustly discriminatory rates and (*b*) the power to declare municipal ordinances unreasonable or arbitrary, and therefore invalid, exercises of delegated authority (*Lipsitz v. Parr,* 164 Md. 222, 232, 233, 164 A. 743; *Jones v. Zoning Appeals Board,* 173 Md. 669, 674, 197 A. 319)—a power which resembles in scope their statutory power to review rate orders of the Public Service Commission. Art. 23, sec. 419. "The power of the commission to fix reasonable rates * * * is legislative, * * * the functions of the

court in reviewing the actions of the Commission are distinctly judicial, and are exercised only for the purpose of determining whether such action of the Commission is unreasonable or unlawful." *Havre de Grace & Perryville Bridge Co. v. Public Service Commission,* 132 Md. 16, 24, 103 A. 319, 322; *Public Service Commission v. Northern Central Ry. Co.,* 122 Md. 355, 388, 90 A. 105; *Prentis v. Atlantic Coast Line,* 211 U. S. 210, 226, 29 S. Ct. 67, 53 L. Ed. 150. In any aspect a rate ordinance is presumed to be reasonable and valid, until the contrary is shown. "The rate is compensation for the service rendered and an equitable determination of the price to be paid does not look alone to the quantity used by each consumer. The nature of the use, and the benefit obtained from it, the number of persons who want it for such use, and, in the case of a city, the effect of a certain method of determining prices upon the revenues to be obtained by the city and upon the interests of property holders are all to be considered." *Dillon on Municipal Corporations,* 5th Ed., sec. 1318; *Ladd v. Boston,* 170 Mass. 332, 335, 336, 49 N. E. 627, 40 L. R. A. 171.

The common law, like present day statutes, required that public utility rates be reasonable, but delegated no power to determine for the future what is reasonable. Direct or delegated legislative determination of maximum rates "establishes no new principle in the law, but only gives a new effect to an old one." *Munn v. Illinois,* 94 U. S. 113, 134, 24 L. Ed. 77. In the absence of direct or delegated legislative regulation of rates, the courts must determine what is reasonable, in a suit by the utility to collect compensation or a suit by the customer to recover excessive compensation exacted from him. The law implies a reasonable compensation, measured by what is ordinarily charged for like services under like conditions—a measure difficult to apply by finding evidence of like services under like conditions. *Public Service Commission v. Northern Central Railway Company, supra,* 122 Md. 389, 90 A. 105. Both the com-

mon law and English and American statutes forbade either excessive rates or unjustly discriminatory rates for like services under like conditions. Neither the common law nor the statutes forbade reasonable classification of rates or discrimination which is not unjust but is reasonable in view of substantial differences in services or in conditions of service. *Texas & Pacific Railway v. Interstate Commerce Commission,* 162 U. S. 197, 16 S. Ct. 666, 40 L. Ed. 940. Both the common law and statutes permit, but ordinarily do not require, classification of rates with regard to differences in cost of service and other considerations. "Whether commutation rates shall be established at all is a question of policy upon the part of the company, but if such a policy is adopted there will still remain the reasonableness of the manner in which that policy is carried out." *Pennsylvania Railroad Company v. Public Service Commission,* 126 Md. 59, 63, 94 A. 330, 332, Ann. Cas. 1917B, 1144, affirmed *Pennsylvania Railroad Company v. Towers,* 245 U. S. 6, 12, 38 S. Ct. 2, 62 L. Ed. 117, L. R. A. 1918C, 475. Although "the State may not select a commodity or class of traffic, and instead of fixing what may be deemed to be reasonable compensation for its carriage, compel the carrier to transport it either at less than cost, or for a compensation that is merely nominal," yet it is recognized "that the State has a broad field for the exercise of its discretion in prescribing reasonable rates for common carriers within its jurisdiction; that it is not necessary that there should be uniform rates or the same percentage of profit on every sort of business; and that there is abundant room for reasonable classification and the adaptation of rates to various groups of services." *Norfolk & Western Railway v. Conley, Attorney General of West Virginia,* 236 U. S. 605, 609, 608, 35 S. Ct. 437, 438, 59 L. Ed. 745; *Pennsylvania Railroad Company v. Public Service Commission, supra,* 126 Md. 72, 94 A. 330, Ann. Cas. 1917B, 1144.

Plaintiff admits that the courts have no ratemaking powers, but contends that they have broader power over

discriminatory rates than over unreasonable rates. There is no basis for such a distinction. The question of unjust discrimination, like the question of reasonableness, is ordinarily a queston of fact to be decided by the rate-making authority. In either case, if the administrative order or municipal ordinance (as the case may be) is unsupported by substantial evidence or in other respects arbitrary or contrary to law, it may be set aside; otherwise it will be sustained. *Interstate Commerce Commission v. Illinois Central Railroad Company*, 215 U. S. 452, 30 S. Ct. 155, 54 L. Ed. 280.

The question before us is not whether the Cumberland rate ordinances embody the best possible classification of rates (which is not a judicial question), but whether the ordinance of 1936 is so unjustly discriminatory and therefore so clearly unreasonable that it is invalid. In *City of Rochester v. Rochester Gas & Electric Corporation*, 233 N. Y. 39, 44, 45, 134 N. E. 828, 830, the legality of a "service charge" by a gas company, approved by a public service commission, was sustained by the Court of Appeals in an elaborate opinion by Judge Cardozo, in which he said: "In the absence of a service charge or some similar device, there is the benefit of facilities, which would otherwise be needless, without the burden of contributing to the cost of supplying or maintaining them. * * * Sometimes this result is avoided through the device of a minimum bill, which differs from a service charge in this only, that the charge is absorbed and disappears when the minimum is reached. For the man who does not take anything, or [takes] less than the amount prescribed, the two devices are the same. Each is an expedient for maintaining the equilibrium between service and requital."

In the instant case the "minimum service charge" (which is not, strictly speaking, a "service charge," but is a "minimum charge" and absorbs the "service charge" when the minimum is reached) is based on the family as a consumer unit. We think this is not an unreasonable classification, though a residential building,

including an apartment house, may also be a reasonable basis for classification, at least in other circumstances or in different rate schedules. *Hunter v. Public Service Commission,* 110 Pa. Super. 589, 168 A. 541; *Lewistown-Reedsville Water Company v. Public Service Commission,* 111 Pa. Super. 24, 169 A. 406. It would, however, seem unjust to small consumers in single or multiple family dwellings to make them the same "minimum service charge" as an apartment house, however large, however small the average consumption of each apartment, and however large the potential or maximum consumption of all the apartments at any one time, and also to give the apartment house a lower consumption rate because of the number of apartments and the consequent large aggregate consumption of many small consumer tenants. No instance has been called to our attention of any city which makes charges on the basis contended for by plaintiff.

Plaintiff's contentions are without factual support. The common law measure of what is ordinarily charged for like services under like conditions cannot be applied —still less can this ordinance be invalidated—by counting heads. If this could be done, the facts do not support plaintiff. Plaintiff says that in a number of cities apartment houses are charged on the basis of a single meter; his list includes, among the largest cities, Baltimore, Buffalo, Cleveland, Detroit, New York, Pittsburgh and Washington—but not Boston, Chicago, Philadelphia, St. Louis, Los Angeles, San Francisco or Oakland. Moreover, plaintiff's data, and cases cited, indicate that in Baltimore and some or all other cities these minimum charges are graduated according to the size of the meter, *i.e.,* the maximum use at any one time. *Lewistown-Reedsville Water Company v. Public Service Commission, supra.* Such a *graduated* minimum charge would be substantially larger for an apartment house containing thirteen apartments than for a single family house or an ordinary or converted dwelling house containing two or three families. Such a charge, in name or in fact, is

both a minimum service charge and a readiness-to-serve charge. The capital investment necessary to serve a customer is not limited by his average consumption, but must include water supply and mains sufficient to supply his *maximum* use, when water is lowest. A minimum charge graduated according to the size of the meter gives an apartment house the benefit of wholesale rates for large *average* consumption, with the corresponding responsibility for a capital charge for *maximum* potential use substantially in excess of average use.

Calling an apartment house a business does not alter the fact that it is an aggregation of dwellings. It is not unreasonable to classify it with other dwellings rather than with hotels. Hotel rates are not in the record. We see no injustice in not classifying apartment houses with other business. The lower court says, "if a hotel is also an apartment house, the apartments therein would fall within the application of the ordinance of 1936 and be chargeable for water as a family unit using a meter."

Plaintiff says it is impossible to determine the cost of serving a "family unit." It is not necessary and ordinarily not possible (except by hypothesis which more nearly approximate guesses than facts) to determine the cost of serving each customer or group of customers. The right of reasonable classification is not so restricted. The record contains no facts as to expenses, except a summary operating statement for 1944, including Interest, $133,425, Sinking Fund-Annual Requirement, $37,-284.00, Distribution to Sinking Fund in accordance with Act of 1922, $56,302; Operating Expenses, $114,322, including, *inter alia*, City Operations, $68,785 and Dam Operations, $27,871. Plaintiff, ignoring "net income" ($54,210) or distribution to sinking fund ($56,302), and in effect reducing rates by the former amount, says capital charges of 170,709 are equivalent to only 5.21¢ per thousand gallons of all consumption, and $114,322.69 operating expenses are equivalent to $12.67 per customer per year (in addition to a consumption charge). These computations are oversimplified and unreal. A

relatively small part of operating expenses (not shown) vary per customer, but obviously "Dam operations" and the greater part of the other operating expenses have no relation to the number of customers. Even meter and service line expenses may be different for different sizes of meters (as is recognized in graduated charges). Capital expenses, for bond interest and sinking fund, as we have said, depend not upon *average* or *actual* use, but upon *maximum* or *potential* use. In any event, the radical rate changes suggested by plaintiff should be proposed to the ratemaking authority, the city, not to the court.

Plaintiff says it is unjust discrimination to serve 2,238 customers on a "flat rate" basis equivalent to less than the meter rate. Since 1932 no new "flat rate" customers have been accepted. As Mr. Justice Holmes said, "The Fourteenth Amendment does not forbid statutes and statutory changes to have a beginning, and thus to discriminate between rights of an earlier and later time." *Sperry & Hutchinson v. Rhodes*, 220 U. S. 502, 505, 31 S. Ct. 490, 491, 55 L. Ed. 561. It is not unlawful to adopt meter rates gradually or to serve some customers at flat rates and others at meter rates. *Shaw v. San Diego Water Co.*, 5 Cal. Unrep. Cas. 808, 50 P. 693; *Exchange & Building Co. v. Roanoke G. & W. Co.*, 90 Va. 83, 17 S. E. 789; *Woodruff v. East Orange*, 71 N. J. Eq. 419, 64 A. 466; *Central I. & S. Co. v. Harrisburg*, 271 Pa. 340, 114 A. 258. Nor is the ordinance invalid because it might be expensive for plaintiff to change his plumbing so as to install thirteen meters. *Ladd v. Boston, supra.* The ordinance gives him the option to install thirteen meters or to pay thirteen times the minimum charge for one apartment.

The lower court says: "We think the minimum service charge provided in the ordinance is not unreasonable or discriminatory. Over 2209 water customers of the defendant are paying upon the same basis as is demanded of the plaintiff. Apartment houses or buildings containing apartments are by the ordinance all placed in the same

category. Some apartment houses in the City of Cumberland are larger than the plaintiff's and many are smaller, many are rebuilt dwelling houses; but nevertheless, they contain apartments—rooms and facilities for a single family." We agree with the lower court that the ordinance is valid.

*Decree affirmed, with costs.*