## THE MAYOR AND COUNCIL OF ROCKVILLE
## *v.* GOLDBERG

[No. 300, September Term, 1969.]

*Decided April 7, 1970.*

564

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Roger W. Titus, City Attorney,* for appellant.

*Robert L. Burchett,* with whom were *James R. Miller, Jr.,* and *Miller, Miller & Canby* on the brief, for appellee.

FINAN, J., delivered the opinion of the Court.

The appellee in this case, Mr. Carl Goldberg (Goldberg), exercising a not so silent majority of one, voted as the only qualified registered voter against the annexation by the Mayor and Council of Rockville (City), appellant, of a tract of 5.9 acres of land which he owned. Thereafter, he was successful in having the Circuit Court for Montgomery County issue a writ of mandamus compelling the City to extend its sewer and water service to this property outside the City limits. It is from the lower court's order issuing the writ that this appeal is taken.

The 5.9 acre tract lies in an unincorporated area of Montgomery County. It is bounded on three sides by land lying within the City and fronts on Seven Locks Road. The tract immediately to the south of appellee's property was annexed to the City of Rockville in 1967. The appellee is the survivor of the joint tenancy between himself and Franklin R. Immerman, and together they acquired the property in January, 1965. On October 27, 1964, while contract purchasers, they successfully obtained rezoning

of the property by the Montgomery County Council from R-R (Rural Residential) to R-T (Town House) classification. Master plans of the City of Rockville and the Maryland National Capital Park and Planning Commission, both adopted prior to 1964, proposed medium density residential development for this property (single family residence on lots in the 9,000 square foot range).

On three occasions (January of 1965, 1966 and 1967), the appellee or his representatives sought to have legislation enacted by the General Assembly which would include his property in the Washington Sanitary District, a necessary prerequisite if that agency is to provide public sewer and water for the property. The appellant opposed such legislation and it was never enacted. In July of 1965, upon application of the appellee, a resolution was passed by the appellant granting annexation of the property to the City. Simultaneously, the property was placed in the City R-75 zoning classification (single family residence on lots in the 7,500 square foot range). Immediately thereafter, the appellee filed a petition for a referendum on the question of the annexation, and in a special election held in September, 1965, he voted against the annexation and, he being the only qualified voter on the issue, the annexation and rezoning never became effective. On September 13, 1968, the appellee, by a letter from his attorney, requested that the appellant furnish his property with water and sewer services and offered to pay all costs. On October 2, 1968, the appellant, in a letter from the City Manager, denied the request. The City Manager's letter advised the appellee that the Mayor and Council had considered his request at their meeting of September 30, 1968, and in denying the request, the letter went on to say that the Mayor and Council "* * * reiterated its policy not to extend water and sewer services to properties located outside the corporate limits."

The City's water treatment plant has sufficient excess capacity to serve the subject property as presently zoned through the water line in Seven Locks Road adjacent to it.

At the trial of this case, the appellee offered the testimony of a civil engineer, Alden E. Imus, who testified that he had made a study of the feasibility of serving the appellee's property with existing water and sewer lines of the appellant. He had concluded that an existing city water line in Seven Locks Road in front of the property could adequately serve it and that an existing city sewer line 800 feet away from the property could be extended and adequately serve the property. In other testimony, he stated that no other public sewer or water line was available to serve the property.

Clifford A. Hilton, an Assistant Planning and Design Division Engineer for the Washington Suburban Sanitary Commission, was the next witness for the appellee. He testified that the property was not in the Washington Suburban Sanitary District and that he would therefore "conclude that they would not provide service" to the property. The closest Sanitary Commission water line, he said, was "in Seven Locks Road approximately half a mile away."

Next to testify for the appellee was C. Richard Foote, City Manager for the City of Rockville, who also appeared for the appellant. In response to a subpoena duces tecum, Mr. Foote provided information as to the actual city operating expenses and income for water and sewer for fiscal 1968 and 1969, and the projected figures for fiscal 1970. In every case, the figures used showed that the water and sewer services were receiving income in excess of expenses, but he explained that in all cases the excess of income over expenses was transferred to a debt retirement fund. In addition, he said that general tax funds pay part of the debt service on some of the water and sewer bonds. Mr. Foote also stated that in three instances, the appellant is providing water or sewer services outside the corporate limits. In the first, the appellant is providing water service to an area known as Glen Hills which is specifically defined by metes and bounds in a franchise granted to the City in 1959 by the Montgomery County Council pursuant to an application filed

by the appellant on March 31, 1959, for a franchise to use the County's public streets for the purpose of laying water pipes therein. The franchise is for a period of 25 years, but is subject to termination earlier by agreement between the Washington Suburban Sanitary Commission and the appellant. This area is not in the vicinity of the appellee's property. The appellant does not provide sewer service to the area. Service to this area did not require the extension of any City water transmission (as opposed to distribution) lines. In both of the remaining instances of existing extraterritorial service, sewer service was provided to respective individual property owners. In both cases a City sewer outfall line leaving the City to join Sanitary Commission sewer lines (which in turn join D. C. lines) existed prior to the development of the property ultimately served. In both cases sewerage service was provided by the City to avoid duplication of facilities in order to provide service at the minimum cost without the overlapping and paralleling of exact same facilities.

In both of the foregoing cases, the properties served are not in the vicinity of the subject property. In another instance the City provided sewer service outside its corporate limits on an emergency basis due to a malfunctioning private sewerage system, creating a health hazard, on the express condition that the owner of the property petition for annexation immediately. A petition was immediately filed and the property is now in the City. This property is also not in the vicinity of the subject property.

The City Manager stated that, in all instances, extraterritorial water or sewer service has been provided at the request of the property owner and that, to his knowledge, the City has never solicited property owners outside the City limits to use its water and sewer services. The City policy with regard to requests for extraterritorial service, he said, is to require annexation before providing sewer or water service. In answer to a ques-

tion from the Court as to the reason for that policy, he stated:

> "I think it is simply a question of building development policy. It is one of the tools under which the City can control the growth and development of the City, along with zoning authority and everything that goes with a functioning municipality. The goal of the Mayor and Council in maintaining a water and sewer system has been purely to serve the residents of the City of Rockville; not to run utility systems specifically for profit or as a separate business, but to serve the corporate limits. And the exceptions to that as noted were not in any case where the City sought to provide a service outside its corporate limits. It is felt that the property owner who might wish to annex or might wish to have water and sewer services, which are partly supported by the general taxpayer, should be a full fledged taxpayer of the City and not just a customer of the water and sewer system."

The City Manager further stated that present extra-territorial users of City water and sewer services pay a higher rate than users of those services located within the City limits, the difference in amount being at least enough to take into account whatever contributions the general tax fund of the City makes in the payment of debt service on certain of the water and sewer bonds. When asked by trial counsel for the appellant what effect the development of the subject property in the R-T zone would have on the surrounding property in terms of the management of the City water and sewer systems, the City Manager stated that he did not know that it would have any direct effect. He also testified that the extension of the sewer line 800 feet to the subject property would be a normal extension.

The testimony of the remaining witnesses duplicated in part that of the prior witnesses, and there again was

testimony that the City sewer system is capable of serving the subject property if developed in its present R-T zoning classification.

We think that the court below in the memorandum opinion, accompanying its order, misconstrued the case law applicable to the facts of this case, wherein the principal issue is: does the law require a municipality to furnish a utility service, where that municipality has undertaken to supply water to an area outside its corporate limits, and the proposed consumer is reasonably within reach of its supply system but not within an area being presently served. The lower court relying primarily on *Bair v. City of Westminster*, 243 Md. 494, 221 A. 2d 643 (1966) and *Home Owners' Loan Corporation v. Baltimore*, 175 Md. 676, 3 A. 2d 747 (1939), held that it did. We hasten to add that the learned judge below, at the time of reaching his decision in the case at bar on September 10, 1969, did not have the benefit of the opinion of this Court in *Mayor and City Council of Cumberland v. Powles*, 255 Md. 574, 258 A. 2d 410. We think this latter case is dispositive of the issue before us. However, for a better understanding as to what the law is on the subject we think a discussion of the Maryland cases appropriate. We state this because we do not believe that the *Powles* case overrules anything that was decided by the Court in *Bair v. City of Westminster*, or any of the earlier cases, but merely further delineates the law.

A reading of *Bair v. City of Westminster, supra,* brings the whole matter of the obligation of a municipality, acting as a public utility, to render extraterritorial service into perspective. In that case Judge Horney writing for the Court reviewed the extent of the obligation of service as promulgated by the Maryland cases up to that time, and we find it helpful to quote from that opinion.

> "While it has been held that a privately owned water company cannot be required to extend its system into an area it had not theretofore served when it is shown that it would

be economically unsound for it to do so, *Public Service Commission v. Brooklyn and Curtis Bay Light & Water Co.*, 122 Md. 612, 90 Atl. 89 (1914), and that a municipality cannot be compelled to extend its water service to a newly annexed area until it is financially able to make the extension, *Schriver v. M. & C. C. of Cumberland*, 169 Md. 286, 181 Atl. 443 (1935), *the rule in this State* (regardless of what it may be elsewhere) *is that where a municipality has undertaken to supply water to an area outside its corporate limits, it must furnish water impartially to all those reasonably within reach of its supply system.* See *Lewis v. M. & C. C. of Cumberland*, 189 Md. 58, 54 A. 2d 319 (1947) ; *Home Owners' Loan Corporation v. M. & C. C. of Baltimore*, 175 Md. 676, 3 A. 2d 747 (1939) and *Merryman v. M. & C. C. of Baltimore*, 153 Md. 419, 138 Atl. 324 (1927). [Emphasis supplied] "* * * In the *Home Owners' Loan Corporation* case, where the owner of property outside the city limits petitioned for a writ of mandamus to compel the city to restore the water service which had been discontinued, it was said (at p. 680 of 175 Md.) :

'It is axiomatic that a public service corporation, private or municipal, is under a duty to furnish to all persons applying therefor the service which it offers without discrimination and at reasonable rates, where the service requested is within the reasonable range of its plant, equipment, lines or mains. * * * Where the service or utility is supplied by a municipality, it has been said that while the purpose must be public and the utility must be impressed with a public interest, nevertheless the municipality acts in its business or proprietary rather than its governmental character, * * *, and that is especially

true where the service is supplied beyond the territorial limits of the municipality, * * *.'
"The above quotation was repeated verbatim in *Lewis* at pp. 65 and 66 of 189 Md.
"* * * And when a municipality undertakes to perform the duties of a public service company, it must, insofar as the services requested are reasonably within its range of performance (as was held in *Home Owners' Loan Corporation* and *Lewis*, both *supra*), furnish its services to all applicants within the area supplied and cannot unjustly discriminate between the consumers therein. 12 McQuillan, *op. cit. supra* § 34.89. * * *" 243 Md. at 497, 498 and 499.

We think the difficulty in construing the law which spells out the municipality's obligation to supply extraterritorial services stems from a misunderstanding of the following language from *Bair*, and which in similar form also appears in *Home Owners' Loan Corporation* and *Lewis:* "[T]he rule in this State is that where a municipality has undertaken to supply water to an area outside its corporate limits it must furnish water impartially to all those reasonably within reach of its supply system." 243 Md. at 497. The above language is susceptible to the interpretation, which we believe is erroneous, that whenever a city extends its utility services, water or sewage, or whatever it may be, to any consumer beyond its corporate limits, then by such action it becomes obligated to furnish the same service to any consumer situated outside of the city limits who may be reasonably within reach of its supply system, although that consumer may live in an area not served by the city nor anywhere near the area to which the extraterritorial service has been extended. We believe such a construction may expose a municipality to an unconscionable burden. If such a construction were assumed correct, it would, as the appellant aptly states, "have a chilling effect on any municipality contemplating services to a specific extraterritorial area or to an isolated consumer by special con-

tract." It would also considerably discourage considerations of inter-governmental cooperation to extend services to any specific areas, short of a plan for perimeter services extending to properties surrounding the entire corporate limits of the municipality.

We think the recent opinion of this Court in *Mayor and City Council of Cumberland v. Powles, supra,* provides us with a common sense explanation of the language found in *Bair, supra, Home Owners' Loan Corporation, supra,* and *Lewis, supra,* in the event there were any unresolved ambiguities, wherein it states:

> "*Clearly a city cannot generally be compelled to supply water in an area outside its limits where it has not hitherto supplied water to such area at all.* Likewise, a city cannot be compelled to supply water to anyone outside its limits even if it is already engaged in doing so where it has made limited and special contracts to do so with particular parties and has not placed itself by contract or conduct in the position of a public utility. *Milwaukee vs. Public Service Commission* [268 Wis. 116], 66 N.W.2d 716." 255 Md. at 578. (Emphasis supplied.)

Clearly, if we apply the language of *Powles* to the instant case, we find that the property of the appellee, although being located reasonably near the city's water supply system and within 800 feet of its sewerage system, is not located in an area outside the city limits where the city has already been supplying water or sewerage. Accordingly the property of the appellee is not in an area which the municipality can be compelled to serve. To further illustrate the point, if the property of the appellee were situated within a reasonable distance from or in the area of Glen Hills, an area already being served by the municipality with water, then the appellee could properly compel the city to extend its water supply service to the subject property. However, as we have already recounted in our statements of facts, the appellee's prop-

erty is nowhere near the vicinity of Glen Hills or any other property presently supplied by the municipality with water or sewerage service.

A holding consonant with *Powles*, and in keeping with our view of the instant case, is found in *Blair v. Manchester Water Works*, 175 A. 2d 525 (N.H. 1961), wherein Chief Justice Kenison writing for the Court stated:

> "* * * The argument is made that by extending its services into the town of Bedford it has placed itself in a position of extending service to anyone in that town if the Public Utilities Commission should so order. This argument cannot be accepted as a reasonable interpretation of our statutes and would do violence to the primary obligation of a municipality to supply water to its own residents. It is more logical and consistent with the statutory intent to hold that a municipality by extending its water system in an adjoining town becomes a public utility, subject to the jurisdiction of the Public Utilities Commission, *only in the specified area into which it has undertaken to extend its water service.* * * * Merely because a municipal utility extends its service to a small area in an adjoining town, the present statutes do not give the Public Utilities Commission authority over the utility to compel it to extend its service over the entire area of the adjoining town." 175 A. 2d at 526-527. (Emphasis supplied)

See also *Town of Beloit v. Public Service Comm.*, 148 N.W.2d 661 (Wisc. 1967), involving the issue of whether a utility may be compelled to serve a certain area. The Court noted, among other observations, "The fact that a utility has extended service a certain distance in one direction does not mean it must serve an equal distance in all directions." *Id.* at 664.

The lower court also thought Code (1965 Repl. Vol.) Article 43, §§ 409 through 429, applicable to the case at

bar and that on the strength of § 414, the appellee could rightfully compel the City to at least supply water service, on the premise that the "Seven Locks Road" water line ran in the public way in front of the appellee's property. Section 414 provides: "Said municipalities shall provide for each and every property abutting upon a street or right of way in which under §§ 409-427 [Art. 43] a watermain or sanitary sewer is laid, a water service pipe or sewer connection * * *."

There was no evidence before the court that the water line in the bed of "Seven Locks Road" was constructed under any enabling provisions of Art. 43, § 409, [Chapter 641, § 348A of the Acts of 1927]. Furthermore, we are satisfied that the purpose of the statute was to provide for water systems and service within municipalities. For example, § 411 authorizes the issuance of bonds to provide funds for the construction of such systems "provided however, that at no time shall the amount of outstanding bonds so issued be more than five (5) per cent of the aggregate assessed valuation of all property listed and assessed for taxation in such municipality," and further that the bonds "shall be a lien on all property within the jurisdiction issuing them." How then, would the appellee's property be burdened with such a lien or be included in the assessable basis on which such a bond issue would be predicated, if it were not within the corporate limits of the municipality? Section 425 provides that in the event a referendum is held to approve the issuance of such bonds, only the voters of the municipality shall vote at such an election or special election at which the question is on the ballot.

There are other references in §§ 409 to 427 which demonstrate that the basic thrust of this legislation was to establish generally the authority, manner and means by which a municipality could construct a water and sewerage system and the relationship which was to exist between the municipality exercising its proprietary function as a utility and the consumers and property owners within its borders.

576

It would make little sense, and no logic, to contend that the use of the terms "property" and "property owners" when referring to the bond issue, assessable basis and referendum provisions of the act, were intended to mean "property" or "property owners" within the municipality, while on the other hand when construing Section 414, which is *pari materia* with §§ 409 to 427, the term "abutting property owners," is meant to include those outside of the city limits.

Therefore, we think reliance on § 414 of Article 43 as the mandate compelling the municipality to serve a property owner fronting on a water line outside the city limits is, to say the least, misplaced. We are of the opinion that the abutting property owners referred to in § 414 are those "upon a street or right of way" within the corporate limits of the municipality.

In light of what we have stated to be our view of the law, we are of the opinion that the lower court erred in issuing the writ.

*Order reversed, appellee to pay costs.*