733 A.2d 1038

**Ronald V.R. SPRING**

v.

**William J. BRADLEY, Jr. et al.**

**No. 121, Sept. Term, 1998.**

Court of Appeals of Maryland.

July 28, 1999.

Warren K. Rich (Rich & Henderson, P.C., on brief), Annapolis, for Appellant.

David R. Thompson (Brynja M. Booth, Cowdrey, Thompson & Karsten, P.A., on brief), Easton, for Appellees.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

WILNER, Judge.

Appellant, Rodney Spring, owns a 13.26–acre undeveloped tract of land in Talbot County that lies adjacent to the Town of Oxford. It is separated from the town boundary by a 20–foot right of way. Since 1990, in an effort to obtain water and sewer service from the town, Spring has sought to have the town annex his property. Although at one point the town considered annexation, it has declined to annex, and it has refused to provide municipal water and sewer service to the Spring property absent annexation.

In May, 1997, Mr. Spring got tired of waiting and filed this action in the Circuit Court for Talbot County to force the town to provide water and sewer service to his property. Claiming that the town had supplied such service to other properties located outside its municipal boundaries, Spring argued that the town had acted as a public service company and was therefore obliged to provide service to all properties outside the town limits, or at least his property, without discrimination. He sought a variety of mandamus, injunctive, and declaratory relief, all directed at requiring the town to provide service to his property. Finding that the town was not required to extend the service, the court entered judgment for the town and its commissioners. Spring appealed, and we granted *certiorari* on our own initiative before any meaningful proceedings in the Court of Special Appeals. We shall affirm the judgment entered below.

## BACKGROUND

Mr. Spring has owned the 13.26–acre tract since 1987. In August, 1990, he formally requested that the town annex the property so that he could construct "affordable housing" on it. In May, 1992, the town planning commission, upon finding that the subdivision planned by Spring satisfied the State growth allocation plan and environmental criteria and, with

one exception, met the town's comprehensive plan, recommended that the property be annexed. The one exception was the preference expressed in the town plan that Oxford remain primarily a single family residential community. The planning commission noted, however, that the proposed subdivision would offer the town a way to start an affordable housing program "in a painless way." In June, the town's attorney informed Spring that the town commissioners had agreed to have an annexation resolution introduced. The attorney warned, however, that the commissioners had not committed to final approval of the resolution, but only to consideration of the proposal. Spring was asked to prepare certain plats and other documents necessary to the resolution, which he did.

At the time, the town was involved in completing the annexation of another property, known as Bachelor's Point, which had been under consideration since 1983, and it had before it as well another annexation request. Opposition from some residents of the town also surfaced to Spring's proposal. At some point, not entirely clear from the record, the town commissioners decided that one annexation was enough at the time, and they declined to introduce the resolution authorizing the annexation of Spring's property. The Bachelor's Point property was finally annexed in April, 1993. Thereafter, the town formed a committee to look into ways of encouraging the development of low and moderately priced housing. That committee's work was ultimately included in a revised comprehensive plan for the town adopted in 1997. The plan calls for land to be set aside for low and moderate priced single family and duplex homes outside the older section of the town and identifies certain areas for such development. Spring's property, along with others, is in one of those growth areas. As of the date of argument in this appeal, however, despite encouragement from the trial judge, the parties have been unable to agree to acceptable terms for an annexation, and no such annexation has occurred.

Spring does not seek, in this litigation, to require the town to annex his property, although that appears to be his ultimate desire. He seeks, instead, to require the town to provide

municipal water and sewer service to his property while it remains outside of the town boundaries and, as noted, he claims a right to that benefit based on the fact that the town has provided such service to at least three other properties lying outside the town limits. He insists that he be treated fairly and be given the same benefit afforded to others in his position. The town denies that he is being treated unfairly and contends that special circumstances attended the provision of service to each of the other properties. Town policy, it maintains, has been consistent—that, as a general rule, it provides no service to property outside the town limits, and that the only exceptions to that policy are where (1) the outlying property has a failing water or septic system, thereby creating a health problem, or (2) the property is subject to an annexation agreement or plan. Spring's property, it avers, meets neither of those criteria.

As we shall see when discussing the controlling cases, whether the town has an obligation to provide service to Spring's property depends, to a large extent, on how it has treated other properties outside its borders, so we shall turn to that now.

The town sewer system was constructed in 1962–63. Immediately upon completion, service was provided to two tracts, known respectively as "Jack's Point" and "Park," that lay outside the town borders. Those tracts contained existing lots of record, some of which were improved with houses. At that time, Maryland Code, Article 66B, § 4.05(d) gave incorporated towns in Talbot County planning and zoning jurisdiction over all land within one mile of their respective boundaries. Jack's Point and Park were within the mile and therefore were thought to be subject to the town's extra-territorial planning and zoning authority. In 1976, we declared the statute providing that extended authority unconstitutional, *Gordon v. Comm'rs of St. Michaels*, 278 Md. 128, 359 A.2d 543 (1976), but the existing service nonetheless continued. In 1988, those tracts were formally annexed by the town.

The town claims that, apart from Jack's Point and Park, the only extensions of service, other than to land subject to annexation, was to one residence and one gas station that had failing septic systems. Spring argues to the contrary. The dispute is over the tract known as Bachelor's Point, and it essentially boils down to the fact that utility service was provided by the town to that development before annexation and, indeed, before there was a mutually binding annexation agreement, although not until there was a fairly clear consensus, evidenced in a written agreement, that the tract would be annexed.

Bachelor's Point is a 90–acre waterfront subdivision located about ¾ of a mile from Spring's property. Annexation efforts began in 1983, but were stalled when the proposed annexation, which would then have included 60 homes on a 28–acre parcel, was defeated in a referendum election. Negotiations continued, and, in April, 1987, the developer and the town entered into an extension of service and annexation agreement. Under that agreement, the proposal for 60 homes was modified to permit only 19 homes on the 28 acres. The developer agreed to record covenants irrevocably committing the lot owners to agree to annexation by the town should the town seek annexation. The town agreed to an extension of water and sewer service from a designated facility, with all costs of the extension to be paid by the developer. The developer was to obtain bids and then determine, from them, whether the project was economically feasible. If it concluded that the project was not feasible, it was required to notify the town and the agreement would be rescinded. Otherwise, the developer was responsible for entering into the necessary construction contracts. The agreement clearly anticipated annexation of the lots, although it did not irrevocably commit either party to that end.

At some point, the developer declared the project feasible, and the parties began to implement the agreement. Covenants committing the lots to annexation were recorded in January, 1988. The developer proceeded with the construction, at a cost of over $330,000. In September, 1988, following the completion of construction, sewer service was extended to

the 19 lots and a commercial marina, and, in April, 1993, the property was formally annexed. As noted, it was during this latter period that Spring's annexation effort surfaced.

## DISCUSSION

We have dealt with the issue presented here in three earlier cases, all decided within a five-year period. In *Bair v. Mayor and City Council of Westminster,* 243 Md. 494, 221 A.2d 643 (1966), the plaintiffs, who owned a tract of land just outside the bounds of Westminster, sought mandamus to compel the city to provide water service to their property. They alleged that they had entered into an agreement with a private water works company for the extension of a water main to the property, that the city subsequently acquired that company, and that the city then refused to honor the agreement. They contended that the city was in the business of supplying water both inside and outside its corporate limits, that it had supplied water to other consumers outside the city, and that the plaintiff's property was within a reasonable distance of an existing water main. The appeal came to us from the sustaining of the city's demurrer, which we reversed.

In at least three earlier cases—*Merryman v. Baltimore,* 153 Md. 419, 138 A. 324 (1927); *Home Owners' Loan Corp. v. Mayor and City Council of Baltimore,* 175 Md. 676, 3 A.2d 747 (1939); and *Lewis v. M. & C.C. of Cumberland,* 189 Md. 58, 54 A.2d 319 (1947)—we had dealt with other issues relating to the provision of utility service by a municipality, and we summarized in *Bair* some of what we had said in those cases. The more relevant point was our general conclusion that "a municipality cannot be required to impose a burden on its utility facilities or on the city itself by providing services to persons who are outside of its corporate limits and beyond its taxing powers." *Bair, supra,* 243 Md. at 498, 221 A.2d at 645. We observed that some courts had concluded that a municipality was not empowered to provide such extended service in the absence of specific statutory authority but that the more recent decisions implied that authority from the power to own

and operate the utility system. Following the latter view, we concluded:

"A municipality, therefore, may dispose of its surplus water (and other public utility services) outside its limits subject only to the prior right of its inhabitants in case of a shortage.... And when a municipality undertakes to perform the duties of a public service company, it must, insofar as the services requested are reasonably within its range of performance ... furnish its services to all applicants within the area supplied and cannot justly discriminate between the customers therein.... Furthermore, when a municipality takes over an existing public utility it must continue to furnish the service not only to consumers within the municipal limits but also furnish the service to consumers outside the municipality theretofore served by the public utility."

*Id.* at 498–99, 221 A.2d at 645.

Having found both the legal authority of a municipality to extend service outside its borders and the duty to continue service previously provided by an acquired utility, we determined that, on the allegations in the petition, the lower court erred in sustaining the demurrer. The plaintiffs would, of course, have to prove the facts they alleged—that they had an existing agreement with the acquired utility, that the city provided service generally outside its corporate limits, and that their property was within a reasonable distance of an existing water main—but the allegations that those things were so sufficed to state a cause of action. Here, of course, there was a significant dispute over the circumstances under which the town provided service outside its borders—a dispute that the trial court resolved in favor of the town.

In *Mayor and City Council of Cumberland v. Powles,* 255 Md. 574, 258 A.2d 410 (1969), the city, pursuant to a 1950 agreement, had been supplying water to the LaVale Sanitary Commission, for further distribution to the residents of LaVale. When the dispute arose, water was being supplied to 17 of 22 lots in the Lucas Heights subdivision in LaVale. The

city retained the right, not to be exercised in an arbitrary manner, to reduce or terminate the supply of water whenever, in its judgment, such action was necessary. In 1968, the city informed the commission that no new taps would be permitted outside the city limits. Although acknowledging that the current water supply was adequate, the city contended that, unless there was a halt in the increase of customers, the city would need to find an additional source of water. Mr. and Mrs. Powles, the owners of an unserved lot in Lucas Heights, sued for mandamus to require the city to permit a tap on their property.

The circuit court granted the petition and we affirmed, adopting the opinion of Judge Getty, the learned trial judge. Judge Getty found as fact, based on demographic projections and the water capacity of the city's existing sources, that limiting taps to domestic customers would not eliminate the need for an additional water source for Cumberland and thus would not produce the desired result. The city would need another source to meet its projected needs "irrespective of the granting or refusal to grant water taps for domestic use in areas presently being served by the system." *Id.* at 578, 258 A.2d at 412. Citing *City of Milwaukee v. Public Service Commission,* 268 Wis. 116, 66 N.W.2d 716 (1954), Judge Getty (and through the adoption of his opinion, we) confirmed that a city could not be compelled to supply water to an area outside its limits when it has not supplied water to that area at all and that "a city cannot be compelled to supply water to anyone outside its limits even if it is already engaged in doing so where it has made limited and special contracts to do so with particular parties and has not placed itself by contract or conduct in the position of a public utility." *Id.,* 258 A.2d at 413. Citing *Bair* and *Lewis v. M. & C.C. of Cumberland, supra,* 189 Md. 58, 54 A.2d 319, we noted the caveat to that general rule—that when a municipality *has* undertaken to supply water to an area outside its corporate limits, "it must furnish water impartially to all those reasonably within reach of its supply system" and that it "is not authorized to make individual determinations on the granting or refusal to grant

water taps ... to pick and choose...." *Id.* at 578–79, 258 A.2d at 413.

In that particular case, Cumberland had entered into a contract that was intended "to include all of the residents served by the LaVale Sanitary Commission." *Id.* at 579, 258 A.2d at 413. There was no existing water shortage or financial crisis that would justify the new policy of not extending service within the area. Thus, we held, "[h]aving contracted to supply water to areas outside its corporate limits, the city must furnish water impartially to all those reasonably within reach of its system," and "[u]nless there are particular circumstances distinguishing the other 15 or 20 applicants who have been denied water taps, the same reasoning would apply." *Id.*

The last case in our trilogy is *Mayor and Council of Rockville v. Goldberg*, 257 Md. 563, 264 A.2d 113 (1970). The property in question—a tract of 5.9 acres—was surrounded on three sides by the City of Rockville. The city at one point had instituted an effort to annex the property but, because the city zoning was less favorable to the owner than the existing county zoning, he resisted, and, through a special referendum election, was able to defeat the annexation. The owner then requested that the city provide water and sewer service to his property, which the city could do from a water main adjacent to the property and a sewer line about 800 feet away. Although the city supplied water (but not sewer) service to a development in another area outside the city limits, it did not provide either water or sewer service to any other property, outside the corporate limits, in the area of Goldberg's property. Nonetheless, the Circuit Court for Montgomery County issued a writ of mandamus requiring the city to provide the service to Goldberg's property.

We reversed. The error committed by the trial court was in assuming that, if a municipality extends utility service to anyone outside its borders, it must extend service to everyone else who requests such service and is within reasonable reach of its distribution system. That, we made clear, was not the case. The statement in *Powles* that, if a municipality under-

takes to supply water to an area outside its limits, "it must furnish water impartially to all those reasonably within reach of its supply system" was limited to those properties in the same area in which the municipality was already supplying general service, and, in that area, was acting as a public service company. Any other construction, we said, would expose the municipality to an unconscionable burden. We iterated the language used in *Powles,* that a city may not be compelled to supply service to an area outside its limits where it had not hitherto supplied service at all, which was the case in *Goldberg,* repeating as well the further statement from *Powles* that "a city cannot be compelled to supply water to anyone outside its limits even if it is already engaged in doing so where it has made limited and special contracts to do so with particular parties and has not placed itself by contract or conduct in the position of a public utility." *Goldberg, supra,* 257 Md. at 573, 264 A.2d at 117 (1970) (quoting *Powles, supra,* 255 Md. at 578, 258 A.2d at 413).

Notwithstanding that the Goldberg property was within reasonable reach of water and sewer lines, it was not located in an area outside the city limits where the city was already supplying those services and therefore was not in an area which the city could be compelled to serve.

Unlike the situation in *Goldberg,* the Spring property *is* within an area in which other properties outside the town limits are currently being supplied with water and sewer service. The telling point, however, is that the service provided to those other properties has all been pursuant to limited and special contracts or circumstances. Unlike the City of Cumberland, which supplied service generally to an entire community and thus assumed the obligation of a public service company to provide service without unreasonable discrimination to all those in that community within reasonable reach of the system, Oxford has supplied extraterritorial service to only three categories of property: those over which it exercised planning and zoning authority when the service was extended; those with failing septic systems, to which municipal service was necessary as a health measure; and the one

property with which it had a special written agreement that anticipated and ultimately led to annexation and required the owner to pay all the costs of the extension.

This case falls squarely within the general rule that we, and most other States (*see* Annotation, *Right to Compel Municipality to Extend its Water System*, 48 A.L.R.2d 1222 (1956 & Supp.)), have consistently applied, and not under any of the exceptions to it. Unlike the Bairs, Spring did not have a service agreement with a private company that the town, through acquisition of the utility, is required to honor. The town has not conducted itself as a public service company through its limited and special extensions of service, and it has not unfairly discriminated against Spring.

JUDGMENT AFFIRMED, WITH COSTS.